Anthony DiGUISEPPE,
Plaintiff-Appellee,

v.

Benjamin WARD, Jack Czarnetsky, Eugene S. Lefevre, Robert K. Woods, Robert LaBrum, Phyllis Curry, and William Donahue, individually and in their official capacities, Defendants,

Benjamin Ward, Robert K. Woods, and Robert LaBrum,
Defendants-Appellants.

Cal. No. 1410, Docket 82–2126.

United States Court of Appeals,
Second Circuit.

Argued Aug. 12, 1982.
Decided Jan. 24, 1983.

---

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Frederic L. Lieberman, Asst. Atty. Gen., New York City, of counsel, George D. Zuckerman, Asst. Sol. Gen. and Gerald J. Ryan, Asst. Atty. Gen., New York City, on the brief), for defendants-appellants.

Queens Legal Services Corp., Jamaica, N.Y. (Eric G. Poulos, Jamaica, N.Y., of counsel, Mark H. Spires, Wayne G. Hawley, Jamaica, N.Y., and Suzanne Berger, Law Intern, on the brief), for plaintiff-appellee.

Before VAN GRAAFEILAND, PIERCE and PRATT, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On this appeal, we are called upon to decide whether the inspection and confiscation of an inmate's personal diary following a prison riot violated the Fourth Amendment. On the facts of this case, our answer is "no".

I.

On August 8, 1977, a serious riot took place at the Eastern New York Correctional Facility in Naponock, New York, where Anthony DiGuiseppe was incarcerated. Characterized by the former Superintendent of Eastern as "the most serious such occurrence in a New York State correctional facility since the Attica riot in 1971", the prisoners' revolt involved the taking of hostages and the extensive destruction of property. During the disturbance, which lasted for ten hours, other correctional institutions sent teams of correction officers to Eastern in order to help secure the facility. After the riot, these teams, known as Correction Emergency Response Teams, conducted strip searches of the inmates and also searched their cells for contraband. In accordance with standard procedures, books were included in the latter search because of the possibility that contraband might be concealed in them. *See Bell v. Wolfish,* 441 U.S. 520, 550–51, 99 S.Ct. 1861, 1880–1881, 60 L.Ed.2d 447 (1979).

On August 10, 1977, one of the Emergency Response Teams, under the leadership of

appellant Woods, searched the cell block in which DiGuiseppe was housed. Two members of the team, one of whom was appellant LaBrum, were assigned to search DiGuiseppe's cell. While conducting the search, LaBrum came upon DiGuiseppe's personal diary. As he examined the book, LaBrum noticed that one entry was dated August 8. LaBrum began to read what DiGuiseppe had written concerning the riot and discovered, among other things, the following statement: "At one point, I jerked the phone out of the wall."[1] LaBrum then took the book to the "contraband" desk where seized items were being logged, and left it with the officer in charge.

From August 10, 1977 to early 1979, DiGuiseppe's diary was kept at the Eastern facility, so that it would be available for use in criminal proceedings growing out of the riot. Meanwhile, a misbehavior report by a correction officer, who had observed DiGuiseppe's actions with the telephone, led to a disciplinary hearing in which DiGuiseppe received a sanction of sixty days keeplock. Although DiGuiseppe at first denied the telephone incident, he eventually admitted that it had occurred.

In June, 1978, DiGuiseppe filed a civil rights complaint in the United States District Court for the Southern District of New York, alleging that the inspection and seizure of his diary, the conduct of his disciplinary hearing, and the nature and extent of his punishment violated his constitutional rights. On April 6, 1981, the parties entered into a stipulation of agreed facts relating to the reading and confiscation of plaintiff's diary, the gravamen of the first two causes of action in plaintiff's amended complaint. Both sides then moved for summary judgment. Plaintiff's motion was limited to the single issue of whether the reading of his diary by LaBrum violated plaintiff's constitutional right of privacy. Defendants' cross-motion was not so limited.

On May 18, 1981, the district court issued a Memorandum and Order, reported at 514 F.Supp. 503, granting plaintiff's motion and denying defendants' cross-motion. Defining the issue before it as whether the reading and taking of the diary violated DiGuiseppe's right of privacy, the district court held:

> The unconsented reading of plaintiff's personal diary by state correction employees having been justified by neither special considerations peculiar to the penal system, nor a reasonable expectation of securing evidence of criminal activity by the plaintiff, we conclude that such reading was unreasonable within the meaning of the Fourth Amendment.

*Id.* at 506.

Following the issuance of its Memorandum and Order, the district court, upon further stipulation of the parties, entered a final judgment against appellants Woods, LaBrum, and Ward, New York State's Commissioner of Correctional Services, in the amount of $2,000. The claims against the remaining defendants were dismissed.

## II.

Because the Constitution does not contain any specific reference to the right of priva-

---

1. Most of the pages in the diary were blank. The parties stipulated that the book contained 142 pages, of which 120 were blank, and that 10 of the written pages dealt with the riot. However, the affidavit upon which the stipulation was based stated that 126 pages were blank and only 5 pages dealt with the riot.

 The page containing the telephone reference, as best we can decipher it, reads as follows:
 It's now 7:10 P.M., demands are out to the public, no answer yet. Men shuttle past the windows, white scarfs tied to their heads.
 Out in the yard temperature was rising. At one point I jerked the phone out of the wall and was prepared to do them all but was intercepted. In people's minds they were readying themselves if the worst occurred, an open battle in the yard. Actually it was very Mickey Mouse as compared with the tense violence that was occurring at B–3. Word was leaked out that "rats" in the "box" were stabbed. The gates were ripped right off the "wings" broken windows in the hall, etc. All day long lies were fed to us in the yard. First they were going to lock us all in South Hall then each in our separate wings. Then they were going to push them out of B–3 into the yard with us. Then no you stay inside. Then we are going to bring food to the yard. Then no food, just locked in your cells and f_____ them. Finally we threatened to take the guards unless food was brought.

cy, it is not always clear on what constitutional amendment a plaintiff bases his claim that his right of privacy has been invaded. Indeed, the courts themselves have had problems in focusing on specific amendments where this issue was involved. *See Whalen v. Roe,* 429 U.S. 589, 598–600 ns. 23–26, 97 S.Ct. 869, 876–877 ns. 23–26, 51 L.Ed.2d 64 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 575–76, 94 S.Ct. 2963, 2984–2985, 41 L.Ed.2d 935 (1974); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973).

■ Although the complaint in the instant case alleges violations of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, plaintiff's brief on appeal asserts merely a violation of his constitutional right of privacy and cites indiscriminately cases involving the First and the Fourth Amendments. *E.g., Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (First Amendment); *United States v. Hinckley,* 525 F.Supp. 1342, 1358–62 (D.C. 1981), *aff'd,* 672 F.2d 115 (D.C.Cir.1982) (Fourth Amendment). We agree with the district court that plaintiff's claim must be viewed in the light of the Fourth Amendment rather than the First. Plaintiff does not contend that the contents of his diary were intended to be disseminated or published. The search by the Correction Emergency Response Team did not impinge, therefore, upon plaintiff's right to speak, nor, of course, upon his right to listen, to believe, or to associate. As Justice White observed in *Wolff v. McDonnell, supra,* 418 U.S. at 576, 94 S.Ct. at 2984, "freedom from censorship is not equivalent to freedom from inspection or perusal." It is the latter freedom, not the former, which is at issue herein. *Whalen v. Roe, supra,* 429 U.S. at 599 n. 24, 97 S.Ct. at 876 n. 24; *United States v. Hinkley, supra,* 672 F.2d at 128–29; *United States v. Vallez,* 653 F.2d 403, 406 (9th Cir.), *cert. denied,* 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981).

■ The test of legitimacy under the Fourth Amendment is "reasonableness", *Bell v. Wolfish, supra,* 441 U.S. at 557–58, 99 S.Ct. at 1883–1884, not the existence *vel non* of a "clear and present danger" to the security of the prison, the test sometimes applied in First Amendment censorship cases, *Wilkinson v. Skinner,* 462 F.2d 670, 672 (2d Cir.1972), and discussed by the district court herein. *See* 514 F.Supp. at 505 and transcript of April 24, 1981 hearing. Clearly, the search of the contents of plaintiff's cell, including his "drawers, beds, and personal items", was reasonable under *Bell v. Wolfish, supra,* 441 U.S. at 557, 99 S.Ct. at 1883. Under the circumstances of this case, we think the reading and seizure of plaintiff's diary was equally so.

■ The search took place less than thirty-six hours after the riot had ended. During the riot, prisoners had taken over the pharmacy, the hospital, and the kitchen. Drugs, scalpels, and knives were missing. The written "Frisk and Search Procedures", under which the Correction Emergency Response Teams operated, required that each inmate be subjected to a strip search and that each cell be "completely frisked" and all contraband found therein removed to the contraband desk. Because it was important for the security of the prison that the missing items be recovered, a mere peek under the bed would not suffice. Prison security and inmate discipline also mandated that the authorities attempt to identify the ringleaders of the riot so that, through appropriate sanctions or institutional transfers, they could be prevented from fomenting further unrest.

■ The record does not indicate that Officer LaBrum was interested in or read any portions of plaintiff's diary that were unrelated to the riot. Indeed, even his observation of the August 8 entry appears to have been fortuitous. Once LaBrum's attention was caught by the entry, it was reasonable for him to conclude that inspection of the riot-related entries was in order; and, when he determined that the diary contained information about inmate participation in the riot, *see* n. 1 *supra,* he was justified in seizing it. *United States v. Vallez, supra,* 653 F.2d at 406; *United States v. Ready,* 574 F.2d 1009, 1013–14 (10th Cir.1978); *United States v. Dawson,*

**606**

516 F.2d 796, 804–06 (9th Cir.), *cert. denied,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975); *United States v. Hitchcock,* 467 F.2d 1107 (9th Cir.1972), *cert. denied,* 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973). *See also, Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); *United States v. Ochs,* 595 F.2d 1247, 1256–68 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

The judgment of the district court is reversed, and the matter is remanded to that court for further proceedings consistent with this opinion.[2]

---

2. The only matter before us is the legality of the search and seizure of the diary. We do not pass upon any events occurring subsequent thereto.