# HUDSON *v.* PALMER

No. 82–1630.   Argued December 7, 1983—Decided July 3, 1984*

*Together with No. 82–6695, *Palmer* v. *Hudson,* also on certiorari to the same court.

518

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in Part II-B of

which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., also joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 537. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 541.

*William G. Broaddus*, Chief Deputy Attorney General of Virginia, argued the cause for petitioner in No. 82–1630 and respondent in No. 82–6695. With him on the briefs were *Gerald L. Baliles*, Attorney General, *Donald C. J. Gehring*, Deputy Attorney General, and *Peter H. Rudy*, Assistant Attorney General.

*Deborah C. Wyatt* argued the cause for respondent in No. 82–1630 and petitioner in No. 82–6695. With her on the briefs was *Leon Friedman*.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in No. 82–1630 to decide whether a prison inmate has a reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches and seizures. We also granted certiorari in No. 82–6695, the cross-petition, to determine whether our decision in *Parratt* v. *Taylor*, 451 U. S. 527 (1981), which held that a negligent deprivation of property by state officials does not violate the Fourteenth Amendment if an adequate postdeprivation state remedy exists, should extend to intentional deprivations of property.

## I

The facts underlying this dispute are relatively simple. Respondent Palmer is an inmate at the Bland Correctional Center in Bland, Va., serving sentences for forgery, uttering, grand larceny, and bank robbery convictions. On September 16, 1981, petitioner Hudson, an officer at the Correctional Center, with a fellow officer, conducted a "shakedown" search of respondent's prison locker and cell for contraband. During the "shakedown," the officers discovered a ripped pillowcase in a trash can near respondent's cell bunk. Charges

against Palmer were instituted under the prison disciplinary procedures for destroying state property. After a hearing, Palmer was found guilty on the charge and was ordered to reimburse the State for the cost of the material destroyed; in addition, a reprimand was entered on his prison record.

Palmer subsequently brought this *pro se* action in United States District Court under 42 U. S. C. § 1983. Respondent claimed that Hudson had conducted the shakedown search of his cell and had brought a false charge against him solely to harass him, and that, in violation of his Fourteenth Amendment right not to be deprived of property without due process of law, Hudson had intentionally destroyed certain of his noncontraband personal property during the September 16 search. Hudson denied each allegation; he moved for and was granted summary judgment. The District Court accepted respondent's allegations as true but held nonetheless, relying on *Parratt* v. *Taylor, supra,* that the alleged destruction of respondent's property, even if intentional, did not violate the Fourteenth Amendment because there were state tort remedies available to redress the deprivation, App. 31[1] and that the alleged harassment did not "rise to the level of a constitutional deprivation," *id.*, at 32.

The Court of Appeals affirmed in part, reversed in part, and remanded for further proceedings. 697 F. 2d 1220 (CA4 1983). The court affirmed the District Court's holding that respondent was not deprived of his property without due process. The court acknowledged that we considered only a claim of negligent property deprivation in *Parratt* v. *Taylor, supra.* It agreed with the District Court, however, that the logic of *Parratt* applies equally to unauthorized intentional deprivations of property by state officials: "[O]nce it is as-

[1] The District Court determined that Palmer could proceed against Hudson in state court either for conversion or for detinue, and that under applicable Virginia law, see *Elder* v. *Holland,* 208 Va. 15, 155 S. E. 2d 369 (1967), Hudson would not be entitled to immunity for the alleged intentional tort.

sumed that a postdeprivation remedy can cure an unintentional but negligent act causing injury, inflicted by a state agent which is unamenable to prior review, then that principle applies as well to random and unauthorized intentional acts." 697 F. 2d, at 1223.[2] The Court of Appeals did not discuss the availability and adequacy of existing state-law remedies; it presumably accepted as correct the District Court's statement of the remedies available under Virginia law.[3]

The Court of Appeals reversed the summary judgment on respondent's claim that the shakedown search was unreasonable. The court recognized that *Bell* v. *Wolfish*, 441 U. S. 520, 555–557 (1979), authorized irregular unannounced shakedown searches of prison cells. But the court held that an individual prisoner has a "limited privacy right" in his cell entitling him to protection against searches conducted solely to harass or to humiliate. 697 F. 2d, at 1225.[4] The shakedown of a single prisoner's property, said the court, is permissible

---

[2] The Court of Appeals observed that "there is no practical mechanism by which Virginia could prevent its guards from conducting personal vendettas against prisoners other than by punishing them after the fact . . . ." 697 F. 2d, at 1223.

[3] See n. 1, *supra.*

[4] Petitioner maintains that the Court of Appeals' decision rests at least in part upon a finding of an independent right of privacy for prisoners under the Fourteenth Amendment alone. Arguably, it is not entirely clear whether the Court of Appeals believed that the limited privacy right it recognized was guaranteed solely by the Fourth Amendment, and applicable to the States only through the Fourteenth Amendment, or whether the right emanated from the Fourteenth Amendment alone, or both. The court's opinion, however, explicitly speaks to the "primary purpose of the Fourth and Fourteenth Amendments," 697 F. 2d, at 1224, and nowhere does it suggest an intention to draw a distinction between the Fourth and Fourteenth Amendment right of privacy in prison cells. Under the circumstances, we assume, since there is no suggestion to the contrary, that the court did not mean to imply in this context that any right of privacy that might exist under the Fourteenth Amendment alone exceeds that which exists under the Fourth Amendment.

only if "done pursuant to an established program of conducting random searches of single cells or groups of cells reasonably designed to deter or discover the possession of contraband" or upon reasonable belief that the particular prisoner possessed contraband. *Id.*, at 1224. Because the Court of Appeals concluded that the record reflected a factual dispute over whether the search of respondent's cell was *routine or conducted to harass* respondent, it held that summary judgment was inappropriate, and that a remand was necessary to determine the purpose of the cell search.

We granted certiorari. 463 U. S. 1206 (1983). We affirm in part and reverse in part.

## II

### A

The first question we address is whether respondent has a right of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches.[5] As we have noted, the Court of Appeals held that the District Court's summary judgment in petitioner's favor was premature because respondent had a "limited privacy right" in his cell that might have been breached. The court concluded that, to protect this privacy right, shakedown searches of an individual's cell should be performed only "pursuant to an established program of conducting ran-

___

[5] The majority of the Courts of Appeals have held that a prisoner retains at least a minimal degree of Fourth Amendment protection in his cell. See *United States* v. *Chamorro*, 687 F. 2d 1 (CA1 1982); *United States* v. *Hinckley*, 217 U. S. App. D. C. 262, 672 F. 2d 115 (1982); *United States* v. *Lilly*, 576 F. 2d 1240 (CA5 1978); *United States* v. *Stumes*, 549 F. 2d 831 (CA8 1977); *Bonner* v. *Coughlin*, 517 F. 2d 1311 (CA7 1975) (vacating District Court judgment), on rehearing, 545 F. 2d 565 (1976) (en banc) (affirming District Court on other grounds), cert. denied, 435 U. S. 932 (1978). The Second and Ninth Circuits, however, have held that the Fourth Amendment does not apply in a prison cell. See *Christman* v. *Skinner*, 468 F. 2d 723 (CA2 1972); *United States* v. *Hitchcock*, 467 F. 2d 1107 (CA9 1972), cert. denied, 410 U. S. 916 (1973).

dom searches . . . reasonably designed to deter or discover the possession of contraband" or upon reasonable belief that the prisoner possesses contraband. Petitioner contends that the Court of Appeals erred in holding that respondent had even a limited privacy right in his cell, and urges that we adopt the "bright line" rule that prisoners have no legitimate expectation of privacy in their individual cells that would entitle them to Fourth Amendment protection.

We have repeatedly held that prisons are not beyond the reach of the Constitution. No "iron curtain" separates one from the other. *Wolff* v. *McDonnell*, 418 U. S. 539, 555 (1974). Indeed, we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. For example, we have held that invidious racial discrimination is as intolerable within a prison as outside, except as may be essential to "prison security and discipline." *Lee* v. *Washington*, 390 U. S. 333 (1968) *(per curiam)*. Like others, prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts. *Johnson* v. *Avery*, 393 U. S. 483 (1969).

Prisoners must be provided "reasonable opportunities" to exercise their religious freedom guaranteed under the First Amendment. *Cruz* v. *Beto*, 405 U. S. 319 (1972) *(per curiam)*. Similarly, they retain those First Amendment rights of speech "not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier*, 417 U. S. 817, 822 (1974). They enjoy the protection of due process. *Wolff* v. *McDonnell, supra; Haines* v. *Kerner*, 404 U. S. 519 (1972). And the Eighth Amendment ensures that they will not be subject to "cruel and unusual punishments." *Estelle* v. *Gamble*, 429 U. S. 97 (1976). The continuing guarantee of these substantial rights to prison inmates is testimony to a belief that the way a society treats those who have trans-

gressed against it is evidence of the essential character of that society.

However, while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights. See *Bell* v. *Wolfish,* 441 U. S., at 545. These constraints on inmates, and in some cases the complete withdrawal of certain rights, are "justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948); see also *Bell* v. *Wolfish, supra,* at 545–546 and cases cited; *Wolff* v. *McDonnell, supra,* at 555. The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of "institutional needs and objectives" of prison facilities, *Wolff* v. *McDonnell, supra,* at 555, chief among which is internal security, see *Pell* v. *Procunier, supra,* at 823. Of course, these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction.

We have not before been called upon to decide the specific question whether the Fourth Amendment applies within a prison cell,[6] but the nature of our inquiry is well defined.

---

[6] In *Lanza* v. *New York,* 370 U. S. 139, 143–144 (1962), a plurality of the Court termed as "at best a novel argument" the assertion that a prison "is a place where [one] can claim constitutional immunity from search or seizure of his person, his papers, or his effects." This observation, however, was plainly dictum. In fact, three Members of the Court specifically dissented from what they characterized as the Court's "gratuitous exposition of several grave constitutional issues . . . ." *Id.,* at 150 (BRENNAN, J., dissenting, joined by Warren, C. J., and Douglas, J.).

In upholding a room search rule against a Fourth Amendment challenge by pretrial detainees in *Bell* v. *Wolfish,* 441 U. S. 520 (1979), the Court acknowledged the plausibility of an argument that "a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person." *Id.,* at 556–557. However, as in *Lanza,* it was unnecessary to reach the issue of the Fourth Amendment's general

We must determine here, as in other Fourth Amendment contexts, if a "justifiable" expectation of privacy is at stake. *Katz* v. *United States*, 389 U. S. 347 (1967). The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979), and cases cited. We must decide, in Justice Harlan's words, whether a prisoner's expectation of privacy in his prison cell is the kind of expectation that "society is prepared to recognize as 'reasonable.'" *Katz, supra,* at 360, 361 (concurring opinion).[7]

Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we

applicability in a prison cell. We simply assumed, *arguendo*, that a pretrial detainee retained at least a "diminished expectation of privacy." 441 U. S., at 557.

[7] In *Katz*, Justice Harlan suggested that an expectation of privacy is "justifiable" if the person concerned has "exhibited an actual (subjective) expectation of privacy" and the expectation is one that "society is prepared to recognize as 'reasonable.'" 389 U. S., at 360, 361 (concurring opinion). The Court has always emphasized the second of these two requirements. As JUSTICE WHITE said, writing for the plurality in *United States* v. *White*, 401 U. S. 745 (1971): "Our problem is not what the privacy expectations of particular defendants in particular situations may be or the extent to which they may in fact have relied on the discretion of their companions. . . . Our problem, in terms of the principles announced in *Katz*, is what expectations of privacy are constitutionally 'justifiable'. . . ." *Id.*, at 751–752. In the same case, even Justice Harlan stressed the controlling importance of the second of these two requirements: "The analysis must, in my view, transcend the search for subjective expectations . . . . [W]e should not, as judges, merely recite the expectations and risks without examining the desirability of saddling them upon society." *United States* v. *White, supra*, at 768, 786 (dissenting opinion).

The Court's refusal to adopt a test of "subjective expectation" is understandable; constitutional rights are generally not defined by the subjective intent of those asserting the rights. The problems inherent in such a standard are self-evident. See, *e. g., Smith* v. *Maryland*, 442 U. S., at 740–741, n. 5.

hold that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for anti-social criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. Even a partial survey of the statistics on violent crime in our Nation's prisons illustrates the magnitude of the problem. During 1981 and the first half of 1982, there were over 120 prisoners murdered by fellow inmates in state and federal prisons. A number of prison personnel were murdered by prisoners during this period. Over 29 riots or similar disturbances were reported in these facilities for the same time frame. And there were over 125 suicides in these institutions. See Prison Violence, 7 Corrections Compendium (Mar. 1983). Additionally, informal statistics from the United States Bureau of Prisons show that in the federal system during 1983, there were 11 inmate homicides, 359 inmate assaults on other inmates, 227 inmate assaults on prison staff, and 10 suicides. There were in the same system in 1981 and 1982 over 750 inmate assaults on other inmates and over 570 inmate assaults on prison personnel.

Within this volatile "community," prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable

measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances.

The administration of a prison, we have said, is "at best an extraordinarily difficult undertaking." *Wolff* v. *McDonnell,* 418 U. S., at 566; *Hewitt* v. *Helms,* 459 U. S. 460, 467 (1983). But it would be literally impossible to accomplish the prison objectives identified above if inmates retained a right of privacy in their cells. Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. Unfettered access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained.

Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza* v. *New York,* 370 U. S. 139, 143–144 (1962). We strike the balance in favor of institutional security, which we have noted is "central to all other corrections goals," *Pell* v. *Procunier,* 417 U. S., at 823. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells

required to ensure institutional security and internal order.[8] We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement." *Bell* v. *Wolfish,* 441 U. S., at 537.

The Court of Appeals was troubled by the possibility of searches conducted solely to harass inmates; it reasoned that a requirement that searches be conducted only pursuant to an established policy or upon reasonable suspicion would prevent such searches to the maximum extent possible. Of course, there is a risk of maliciously motivated searches, and of course, intentional harassment of even the most hardened criminals cannot be tolerated by a civilized society. However, we disagree with the court's proposed solution. The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband. The Court of Appeals candidly acknowledged that "the device [of random cell searches] is of . . . obvious utility in achieving the goal of prison security." 697 F. 2d, at 1224.

---

[8] Respondent contends also that the destruction of his personal property constituted an unreasonable *seizure* of that property violative of the Fourth Amendment. Assuming that the Fourth Amendment protects against the destruction of property, in addition to its mere seizure, the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures. Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests.

That the Fourth Amendment does not protect against seizures in a prison cell does not mean that an inmate's property can be destroyed with impunity. We note, for example, that even apart from inmate grievance procedures, see n. 9, *infra,* respondent has adequate state remedies for the alleged destruction of his property. See discussion *infra,* at 534–536.

A requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon. It is simply naive to believe that prisoners would not eventually decipher any plan officials might devise for "planned random searches," and thus be able routinely to anticipate searches. The Supreme Court of Virginia identified the shortcomings of an approach such as that adopted by the Court of Appeals and the necessity of allowing prison administrators flexibility:

> "For one to advocate that prison searches must be conducted only pursuant to an enunciated general policy or when suspicion is directed at a particular inmate is to ignore the realities of prison operation. Random searches of inmates, individually or collectively, and their cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates and all others within its boundaries. This type of search allows prison officers flexibility and prevents inmates from anticipating, and thereby thwarting, a search for contraband." *Marrero* v. *Commonwealth*, 222 Va. 754, 757, 284 S. E. 2d 809, 811 (1981).

We share the concerns so well expressed by the Supreme Court and its view that wholly random searches are essential to the effective security of penal institutions. We, therefore, cannot accept even the concededly limited holding of the Court of Appeals.

Respondent acknowledges that routine shakedowns of prison cells are essential to the effective administration of prisons. Brief for Respondent and Cross-Petitioner 7, n. 5. He contends, however, that he is constitutionally entitled not to be subjected to searches conducted only to harass. The crux of his claim is that "because searches and seizures to harass are unreasonable, a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose." *Id.*, at 24. This argu-

ment, which assumes the answer to the predicate question whether a prisoner has a legitimate expectation of privacy in his prison cell at all, is merely a challenge to the reasonableness of the particular search of respondent's cell. Because we conclude that prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells, we need not address this issue.

Our holding that respondent does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment does not mean that he is without a remedy for calculated harassment unrelated to prison needs. Nor does it mean that prison attendants can ride roughshod over inmates' property rights with impunity. The Eighth Amendment always stands as a protection against "cruel and unusual punishments." By the same token, there are adequate state tort and common-law remedies available to respondent to redress the alleged destruction of his personal property. See discussion *infra*, at 534–536.[9]

### B

In his complaint in the District Court, in addition to his claim that the shakedown search of his cell violated his Fourth and Fourteenth Amendment privacy rights, respondent alleged under 42 U. S. C. § 1983 that petitioner intentionally destroyed certain of his personal property during the search. This destruction, respondent contended, deprived him of property without due process, in violation of the Due Process Clause of the Fourteenth Amendment. The District Court dismissed this portion of respondent's complaint for failure to state a claim. Reasoning under *Parratt* v. *Taylor*,

---

[9] The Commonwealth has a new inmate grievance procedure that was effective as of October 12, 1982, see n. 14, *infra*. But it appears that at the time of the alleged deprivation of respondent's property, a very similar procedure was in effect that would also have afforded respondent relief for any destruction of his property. See Reply Brief for Petitioner and Cross-Respondent 13, n. 14.

451 U. S. 527 (1981), it held that even an intentional destruction of property by a state employee does not violate due process if the state provides a meaningful postdeprivation remedy. The Court of Appeals affirmed. The question presented for our review in Palmer's cross-petition is whether our decision in *Parratt* v. *Taylor* should extend, as the Court of Appeals held, to intentional deprivations of property by state employees acting under color of state law.[10]

In *Parratt* v. *Taylor*, a state prisoner sued prison officials under 42 U. S. C. § 1983, alleging that their negligent loss of a hobby kit he ordered from a mail-order catalog deprived him of property without due process of law, in violation of the Fourteenth Amendment. The Court of Appeals for the Eighth Circuit had affirmed the District Court's summary judgment in the prisoner's favor. We reversed, holding that the Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property, provided that the state makes available a meaningful postdeprivation remedy.[11]

We viewed our decision in *Parratt* as consistent with prior cases recognizing that

> "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some

---

[10] Four Circuits, including the Fourth Circuit in these cases, have held that *Parratt* extends to intentional deprivations of property. See *Wolf-Lillie* v. *Sonquist*, 699 F. 2d 864 (CA7 1983); *Engblom* v. *Carey*, 677 F. 2d 957 (CA2 1982); *Rutledge* v. *Arizona Board of Regents*, 660 F. 2d 1345 (CA9 1981), aff'd *sub nom. Kush* v. *Rutledge*, 460 U. S. 719 (1983). Three Circuits have held that it does not. *Brewer* v. *Blackwell*, 692 F. 2d 387 (CA5 1982); *Weiss* v. *Lehman*, 676 F. 2d 1320 (CA9 1982); *Madyun* v. *Thompson*, 657 F. 2d 868 (CA7 1981).

[11] Nebraska had provided respondent with a tort remedy for his alleged property deprivation. Neb. Rev. Stat. § 81–8,209 *et seq.* (1976). We held that this remedy was entirely adequate to satisfy due process, even though we recognized that it might not provide respondent all the relief to which he might have been entitled under § 1983. 451 U. S., at 543–544.

meaningful means by which to assess the propriety of the State's action at some time after the initial taking . . . satisf[ies] the requirements of procedural due process." 451 U. S., at 539 (footnote omitted).

We reasoned that where a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure, the state cannot predict when the loss will occur. *Id.*, at 541. Under these circumstances, we observed:

"It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." *Ibid.*[12]

Two Terms ago, we reaffirmed our holding in *Parratt* in *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422 (1982), in the course of holding that postdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action.[13]

---

[12] In reaching our conclusion in *Parratt*, we expressly relied on then-Judge Stevens' opinion for the Seventh Circuit in *Bonner* v. *Coughlin*, 517 F. 2d 1311 (1975), modified en banc, 545 F. 2d 565 (1976), cert. denied, 435 U. S. 932 (1978), holding that, where an individual has been negligently deprived of property by a state employee, the state's action is not complete unless or until the state fails to provide an adequate postdeprivation remedy for the property loss. 451 U. S., at 541–542.

[13] In *Logan*, we examined a claim that the terms of an Illinois statute deprived the petitioner of an opportunity to pursue his employment discrimination claim. We specifically distinguished the case from *Parratt* by noting that "*Parratt* . . . was dealing with a . . . 'random and unauthorized act by a state employee . . . [and was] not a result of some established state procedure.'" 455 U. S., at 435–436 (quoting *Parratt*, 451 U. S., at 541). *Parratt*, we said, "was not designed to reach . . . a situation" where the

While *Parratt* is necessarily limited by its facts to negligent deprivations of property, it is evident, as the Court of Appeals recognized, that its reasoning applies as well to intentional deprivations of property.   The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur.   We can discern no logical distinction between negligent and intentional deprivations of property insofar as the "practicability" of affording predeprivation process is concerned.   The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct. Arguably, intentional acts are even more difficult to anticipate because one bent on intentionally depriving a person of his property might well take affirmative steps to avoid signalling his intent.

If negligent deprivations of property do not violate the Due Process Clause because predeprivation process is impracticable, it follows that intentional deprivations do not violate that Clause provided, of course, that adequate state postdeprivation remedies are available.   Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.   For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.[14]

---

deprivation is the result of an established state procedure.   455 U. S., at 436.

[14] Our holding that an intentional deprivation of property does not give rise to a violation of the Due Process Clause if the state provides an adequate postdeprivation remedy was foreshadowed by our discussion of

Respondent presses two arguments that require at least brief comment. First, he contends that, because an agent of the state who intends to deprive a person of his property "*can* provide predeprivation process, then as a matter of due process he must do so." Brief for Respondent and Cross-Petitioner 8 (emphasis in original). This argument reflects a fundamental misunderstanding of *Parratt.* There we held that postdeprivation procedures satisfy due process because the *state* cannot possibly know in advance of a negligent deprivation of property. Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process.

Respondent also contends, citing to *Logan* v. *Zimmerman Brush Co., supra,* that the deliberate destruction of his property by petitioner constituted a due process violation despite the availability of postdeprivation remedies. Brief for Respondent and Cross-Petitioner 8. In *Logan,* we decided a question about which our decision in *Parratt* left little doubt, that is, whether a postdeprivation state remedy satisfies due process where the property deprivation is effected pursuant to an established state procedure. We held that it does not. *Logan* plainly has no relevance here. Respondent does not even allege that the asserted destruction of his property occurred pursuant to a state procedure.

Having determined that *Parratt* extends to intentional deprivations of property, we need only decide whether the Commonwealth of Virginia provides respondent an adequate postdeprivation remedy for the alleged destruction of his property. Both the District Court and, at least implicitly, the Court of Appeals held that several common-law remedies

*Ingraham* v. *Wright,* 430 U. S. 651 (1977), in *Parratt.* We noted that our analysis was "quite consistent" with that in *Ingraham,* a case that, we observed, involved intentional conduct on behalf of state officials. 451 U. S., at 542.

available to respondent would provide adequate compensation for his property loss. We have no reason to question that determination, particularly given the speculative nature of respondent's arguments.

Palmer does not seriously dispute the adequacy of the existing state-law remedies themselves. He asserts in this respect only that, because certain of his legal papers allegedly taken "may have contained things irreplacable [sic], and incompensable" or "may also have involved sentimental items which are of equally intangible value," Brief for Respondent and Cross-Petitioner 10–11, n. 10, a suit in tort, for example, would not "necessarily" compensate him fully. If the loss is "incompensable," this is as much so under § 1983 as it would be under any other remedy. In any event, that Palmer might not be able to recover under these remedies the full amount which he might receive in a § 1983 action is not, as we have said, determinative of the adequacy of the state remedies. See *Parratt*, 451 U. S., at 544.

Palmer contends also that relief under applicable state law "is far from certain and complete" because a state court might hold that petitioner, as a state employee, is entitled to sovereign immunity. Brief for Respondent and Cross-Petitioner 11. This suggestion is unconvincing. The District Court and the Court of Appeals held that respondent's claim would not be barred by sovereign immunity. As the District Court noted, under Virginia law, "a State employee may be held liable for his intentional torts," *Elder* v. *Holland*, 208 Va. 15, 19, 155 S. E. 2d 369, 372–373 (1967); see also *Short* v. *Griffitts*, 220 Va. 53, 255 S. E. 2d 479 (1979). Indeed, respondent candidly acknowledges that it is "probable that a Virginia trial court would rule that there should be no immunity bar in the present case." Brief for Respondent and Cross-Petitioner 14.

Respondent attempts to cast doubt on the obvious breadth of *Elder* through the naked assertion that "the phrase 'may

be held liable' could have meant . . . only the possibility of liability under certain circumstances rather than a blanket rule . . . ." Brief for Respondent and Cross-Petitioner 13. We are equally unpersuaded by this speculation. The language of *Elder* is unambiguous that employees of the Commonwealth do not enjoy sovereign immunity for their intentional torts, and *Elder* has been so read by a number of federal courts, as respondent concedes, see Brief for Respondent and Cross-Petitioner 13, n. 13. See, *e. g., Holmes* v. *Wampler*, 546 F. Supp. 500, 504 (ED Va. 1982); *Irshad* v. *Spann*, 543 F. Supp. 922, 928 (ED Va. 1982); *Frazier* v. *Collins*, 544 F. Supp. 109, 110 (ED Va. 1982); *Whorley* v. *Karr*, 534 F. Supp. 88, 89 (WD Va. 1981); *Daughtry* v. *Arlington County, Va.*, 490 F. Supp. 307 (DC 1980).[15] In sum, it is evident here, as in *Parratt*, that the State has provided an adequate postdeprivation remedy for the alleged destruction of property.

## III

We hold that the Fourth Amendment has no applicability to a prison cell. We hold also that, even if petitioner intentionally destroyed respondent's personal property during the challenged shakedown search, the destruction did not violate the Fourteenth Amendment since the Commonwealth of Virginia has provided respondent an adequate postdeprivation remedy.

Accordingly, the judgment of the Court of Appeals reversing and remanding the District Court's judgment on respond-

---

[15] It is noteworthy that the Commonwealth has enacted the State Tort Claims Act, Va. Code § 8.01–195.1 *et seq.* (Supp. 1983), which, in defined circumstances, waives sovereign immunity. Additionally, as of October 12, 1982, the State has in place an inmate grievance procedure that received the certification of the Attorney General of the United States as in compliance with the Civil Rights of Institutionalized Persons Act, 42 U. S. C. § 1997e. Although apparently neither of these avenues was open to this respondent, both are potential sources of relief for persons in respondent's position in the future.

ent's claim under the Fourth and Fourteenth Amendments is reversed. The judgment affirming the District Court's decision that respondent has not been denied due process under the Fourteenth Amendment is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

The courts of this country quite properly share the responsibility for protecting the constitutional rights of those imprisoned for the commission of crimes against society. Thus, when a prisoner's property is wrongfully destroyed, the courts must ensure that the prisoner, no less than any other person, receives just compensation. The Constitution, as well as human decency, requires no less. The issue in these cases, however, does not concern *whether* a prisoner may recover damages for a malicious deprivation of property. Rather, these cases decide only *what* is the appropriate source of the constitutional right and the remedy that corresponds with it. I agree with the Court's treatment of these issues and therefore join its opinion and judgment today. I write separately to elaborate my understanding of why the complaint in this litigation does not state a ripe constitutional claim.

The complaint alleges three types of harm under the Fourth Amendment: invasion of privacy from the search, temporary deprivation of the right to possession from the seizure, and permanent deprivation of the right to possession as a result of the destruction of the property. The search and seizure allegations can be handled together. They would state a ripe Fourth Amendment claim if, on the basis of the facts alleged, they showed that government officials had acted unreasonably. The Fourth Amendment "reasonableness" determination is generally conducted on a case-by-case basis, with the Court weighing the asserted governmental interests against the particular invasion of the individual's

privacy and possessory interests as established by the facts of the case. See *Terry* v. *Ohio*, 392. U. S. 1, 17–18, n. 15 (1968). In some contexts, however, the Court has rejected the case-by-case approach to the "reasonableness" inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion. See, *e. g.*, *United States* v. *Robinson*, 414 U. S. 218, 235 (1973) (searches incident to lawful custodial arrest); *Bell* v. *Wolfish*, 441 U. S. 520, 555–560 (1979) (prison room search and body cavity search rules). For the reasons stated by the Court, see *ante*, at 526–530, I agree that the government's compelling interest in prison safety, together with the necessarily ad hoc judgments required of prison officials, make prison cell searches and seizures appropriate for categorical treatment. See generally LaFave, "Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma, 1974 S. Ct. Rev. 127, 141–145. The fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects, see *Lanza* v. *New York*, 370 U. S. 139, 143 (1962); cf. *United States* v. *Robinson, supra*, at 237–238 (POWELL, J., concurring) (individual in custody retains no significant Fourth Amendment interest), and therefore all searches and seizures of the contents of an inmate's cell are reasonable.

The allegation that respondent's property was destroyed without legitimate reason does not alter the Fourth Amendment analysis in these prison cases. To be sure, the duration of a seizure is ordinarily a factor to be considered in Fourth Amendment analysis. See *United States* v. *Place*, 462 U. S. 696, 709–710 (1983). Similarly, the actual destruction of a possessory interest is generally considered in determining the reasonableness of a seizure. See *United States* v. *Jacobsen*, 466 U. S. 109, 124–125 (1984). But if the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth

Amendment concern. The nonprivacy interests protected by the Fourth Amendment do not extend beyond the right against unreasonable dispossessions. Since the exigencies of prison life authorize officials indefinitely to dispossess inmates of their possessions without specific reason, any losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation.

That the Fourth Amendment does not protect a prisoner against indefinite dispossession does not mean that he is without constitutional redress for the deprivations that result. The Due Process and Takings Clauses of the Fifth and Fourteenth Amendments stand directly in opposition to state action intended to deprive people of their legally protected property interests. These constitutional protections against the deprivation of private property do not abate at the time of imprisonment.

Of course, a mere allegation of property deprivation does not by itself state a constitutional claim under either Clause. The Constitution requires the government, if it deprives people of their property, to provide due process of law and to make just compensation for any takings. The due process requirement means that government must provide to the inmate the remedies it promised would be available. See *Parratt* v. *Taylor*, 451 U. S. 527, 537–544 (1981). Concomitantly, the just compensation requirement means that the remedies made available must adequately compensate for any takings that have occurred. See *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1016–1020 (1984). Thus, in challenging a property deprivation, the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate. See *Parratt* v. *Taylor, supra,* at 537–544. When adequate remedies are provided and followed, no uncompensated taking or deprivation of property without due process can result.

This synthesis of the constitutional protections accorded private property corresponds, I believe, with both common

sense and common understanding. When a person is arrested and incarcerated, his personal effects are routinely "searched," "seized," and placed in official custody. See *Illinois* v. *Lafayette*, 462 U. S. 640, 643–647 (1983); *United States* v. *Edwards*, 415 U. S. 800, 804–807 (1974). Such searches and seizures are necessary both to protect the detainee's effects and to maintain the security of the detention facility. The effects seized are generally inventoried, noticed by receipt, and stored for return to the person at the time of his release. The loss, theft, or destruction of property so seized has not, to my knowledge, ever been thought to state a Fourth Amendment claim. Rather, improper inventories, defective receipts, and missing property have long been redressable in tort by actions for detinue, trespass to chattel, and conversion. Cf. *Kosak* v. *United States*, 465 U. S. 848 (1984) (discussing liability of Federal Government for losses incurred during customs officials' searches and seizures). Whether those remedies are adequate and made available as promised have always been questions for the Takings and Due Process Clauses. The Fourth Amendment has never had a role to play.

In sum, while I share JUSTICE STEVENS' concerns about the rights of prison inmates, I do not believe he has correctly identified the constitutional sources that provide their property with protection. Those sources are the Due Process and the Takings Clauses of the Fifth and Fourteenth Amendments, not the Search and Seizure Clause of the Fourth Amendment. In these cases, the Commonwealth of Virginia has demonstrated that it provides aggrieved inmates with a grievance procedure and various state tort and common-law remedies. The plaintiff inmate has not availed himself of these remedies or successfully proved that they are inadequate. Thus, his complaint cannot be said to have stated a ripe constitutional claim and summary judgment for the defendant was proper.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, concurring in part and dissenting in part.

This case comes to us on the pleadings. We must take the allegations in Palmer's complaint as true.[1] Liberally construing this *pro se* complaint as we must,[2] it alleges that after examining it, prison guard Hudson maliciously took and destroyed a quantity of Palmer's property, including legal materials and letters, for no reason other than harassment.[3] For the reasons stated in Part II–B of the opinion of the Court, I agree that Palmer's complaint does not allege a violation of his constitutional right to procedural due process.[4] The reasoning in Part II–A of the Court's opinion, however,

---

[1] See *Hughes* v. *Rowe*, 449 U. S. 5, 10 (1980) *(per curiam); California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 515–516 (1972); *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172, 174–175 (1965); *Cooper* v. *Pate*, 378 U. S. 546 (1964) *(per curiam).*

[2] See *Boag* v. *MacDougall*, 454 U. S. 364 (1982) *(per curiam); Haines* v. *Kerner*, 404 U. S. 519 (1972) *(per curiam).*

[3] "On 9-16-81 around 5:50 p. m., officer Hudson shook down my locker and destroyed a lot of my property, *i. e.:* legal materials, letters, and other personal property only as a means of harassment. Officer Hudson has violated my Constitutional rights. The shakedown was no routine shakedown. It was planned and carried out only as harassment. Hudson stated the next time he would really mess my stuff up. I have plenty of witnesses to these facts." App. 7–8.

[4] I join Part II–B of the opinion of the Court on the understanding that it simply applies the holding of *Parratt* v. *Taylor*, 451 U. S. 527 (1981), to the facts of this case. I do not understand the Court's holding to apply to conduct that violates a substantive constitutional right—actions governmental officials may not take no matter what procedural protections accompany them, see *Parratt*, 451 U. S., at 545 (BLACKMUN, J., concurring); see also *id.*, at 552–553 (POWELL, J., concurring in result); or to cases in which it is contended that the established prison procedures themselves create an unreasonable risk that prisoners will be unjustifiably deprived of their property, see *id.*, at 543; see also *Block* v. *Rutherford, post*, at 591–592, n. 12; *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 435–436 (1982).

is seriously flawed—indeed, internally inconsistent. The Court correctly concludes that the imperatives of prison administration require random searches of prison cells, and also correctly states that in the prison context "[o]f course, there is a risk of maliciously motivated searches, and of course, intentional harassment of even the most hardened criminals cannot be tolerated by a civilized society." *Ante*, at 528. But the Court then holds that no matter how malicious, destructive, or arbitrary a cell search and seizure may be, it cannot constitute an unreasonable invasion of any privacy or possessory interest that society is prepared to recognize as reasonable. *Ante*, at 525–526.

Measured by the conditions that prevail in a free society, neither the possessions nor the slight residuum of privacy that a prison inmate can retain in his cell, can have more than the most minimal value. From the standpoint of the prisoner, however, that trivial residuum may mark the difference between slavery and humanity. On another occasion, THE CHIEF JUSTICE wrote:

> "It is true that inmates lose many rights when they are lawfully confined, but they do not lose all civil rights. Inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others." *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 5, n. 2 (1978) (plurality opinion) (citation omitted).

Personal letters, snapshots of family members, a souvenir, a deck of cards, a hobby kit, perhaps a diary or a training manual for an apprentice in a new trade, or even a Bible—a variety of inexpensive items may enable a prisoner to maintain contact with some part of his past and an eye to the possibility of a better future. Are all of these items subject to unrestrained perusal, confiscation, or mutilation at the hands of a possibly hostile guard? Is the Court correct in its

perception that "society" is not prepared to recognize *any* privacy or possessory interest of the prison inmate—no matter how remote the threat to prison security may be?

I

Even if it is assumed that Palmer had no reasonable expectation of privacy in most of the property at issue in this case because it could be inspected at any time, that does not mean he was without Fourth Amendment protection.[5] For the Fourth Amendment protects Palmer's possessory interests in this property entirely apart from whatever privacy interest he may have in it.

> "The first Clause of the Fourth Amendment provides that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .' This text protects two kinds of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen,* 466 U. S. 109, 113 (1984) (footnotes omitted).[6]

---

[5] Though I am willing to assume that for purposes of this case that the Court's holding concerning most of Palmer's privacy interests is correct, that should not be taken as an endorsement of the Court's new "bright line" rule that a prisoner can have no expectation of privacy in his papers or effects, *ante,* at 523. I cannot see any justification for applying this rule to minimum security facilities in which inmates who pose no realistic threat to security are housed. I also see no justification for reading the mail of a prisoner once it has cleared whatever censorship mechanism is employed by the prison and has been received by the prisoner.

[6] See also *United States* v. *Karo, post,* at 712; *United States* v. *Place,* 462 U. S. 696, 707 (1983); *id.,* at 716 (BRENNAN, J., concurring in result); *Texas* v. *Brown,* 460 U. S. 730, 747–748 (1983) (STEVENS, J., concurring in judgment).

There can be no doubt that the complaint adequately alleges a "seizure" within the meaning of the Fourth Amendment. Palmer was completely deprived of his possessory interests in his property; by taking and destroying it, Hudson was asserting "dominion and control" over it; hence his conduct "did constitute a seizure," *id.*, at 120.[7] The fact that the property was destroyed hardly alters the analysis—the possessory interests the Fourth Amendment protects are those of the citizen. From the citizen's standpoint, it makes no difference what the government does with his property once it takes it from him; he is just as much deprived of his possessory interests when it is destroyed as when it is merely taken.[8] This very Term, in *Jacobsen*, we squarely held that destruction of property in a field test for cocaine constituted a constitutionally cognizable interference with possessory interests: "[T]he field test did affect respondents' possessory interests protected by the [Fourth] Amendment, since by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one." *Id.*, at 124–125.

The Court suggests that "the interest of society in the security of its penal institutions" precludes prisoners from

---

[7] See also *Bell* v. *Wolfish*, 441 U. S. 520, 574–575 (1979) (MARSHALL, J., dissenting).

[8] JUSTICE O'CONNOR, like the other Members of the majority, would apparently draw a distinction between the physical destruction of the prisoner's property and its "indefinite retention," see *ante*, at 538 (concurring opinion), in that the former may be actionable under the Due Process and Taking Clauses. I am not entirely sure whether she believes that an inmate can be harassed consistently with the Fourth Amendment by temporarily taking custody of his correspondence and family snapshots, for example, because "incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects," *ibid.*, or because "all searches and seizures of the contents of an inmate's cell are reasonable," *ibid.* The net result of her position, however, is that harassment by means of temporarily—*i. e.*, for no longer than the duration of the prisoner's incarceration—depriving an inmate of his personal effects raises no Fourth Amendment issue, and no constitutional issue of any kind if the property is ultimately returned.

having any legitimate possessory interests. *Ante,* at 527–528, and n. 8.[9] See also *ante,* at 538 (O'CONNOR, J., concurring). That contention is fundamentally wrong for at least two reasons.

First, Palmer's possession of the material was entirely legitimate as a matter of state law. There is no contention that the material seized was contraband or that Palmer's possession of it was in any way inconsistent with applicable prison regulations. Hence, he had a legal right to possess it. In fact, the Court's analysis of Palmer's possessory interests is at odds with its treatment of his due process claim. In Part II–B of its opinion, the Court holds that the material which Hudson took and destroyed was "property" within the meaning of the Due Process Clause. *Ante,* at 533–534. See also *ante,* at 539–540 (O'CONNOR, J., concurring). Indeed, this holding is compelled by *Parratt* v. *Taylor,* 451 U. S. 527 (1981), in which we held that a $23.50 hobby kit which had been mail-ordered but not received by a prisoner was "property" within the meaning of the Due Process Clause. See *id.,* at 536.[10] However, an interest cannot qualify as "property" within the meaning of the Due Process Clause unless it amounts to a legitimate claim of entitlement.[11] Thus in Part

---

[9] The existence of state remedies for this seizure, to which the Court adverts, *ante,* at 528, n. 8, as does JUSTICE O'CONNOR, *ante,* at 540, is of course irrelevant to the Fourth Amendment question, since 42 U. S. C. § 1983 provides a remedy for Fourth Amendment violations supplemental to any state remedy that may exist. *Monroe* v. *Pape,* 365 U. S. 167, 183 (1961). See *Burnett* v. *Grattan, ante,* at 50; *Patsy* v. *Florida Board of Regents,* 457 U. S. 496 (1982); *Fair Assessment in Real Estate Assn., Inc.* v. *McNary,* 454 U. S. 100, 104 (1981); *Allen* v. *McCurry,* 449 U. S. 90, 99 (1980); *Paul* v. *Davis,* 424 U. S. 693, 710, n. 5 (1976); *Wilwording* v. *Swenson,* 404 U. S. 249, 251 (1971) *(per curiam); McNeese* v. *Board of Education,* 373 U. S. 668, 671–674 (1963). See also n. 4, *supra.*

[10] On this point, the Court was unanimous, see 451 U. S., at 546–548 (POWELL, J., concurring in result), as it is today.

[11] See, *e. g., Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1003–1004 (1984); *Logan* v. *Zimmerman Brush Co.,* 455 U. S., at 430–431; *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155, 161 (1980); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 7 (1979); *Leis* v. *Flynt,*

II–B of its opinion the Court necessarily indicates that Palmer had a legitimate claim of entitlement to the material at issue. It is well settled that once a State creates such a constitutionally protected interest, the Constitution forbids it to deprive even a prisoner of such an interest arbitrarily.[12] Thus, Palmer had a legitimate right under both state law and the Due Process Clause to possess the material at issue. That being the case, the Court's own analysis indicates that Palmer had a legitimate possessory interest in the material within the Fourth Amendment's proscription on unreasonable seizures.

Second, the most significant of Palmer's possessory interests are protected as a matter of substantive constitutional law, entirely apart from the legitimacy of those interests under state law or the Due Process Clause. The Eighth Amendment forbids "cruel and unusual punishments." Its proscriptions are measured by society's "evolving standards of decency," *Rhodes* v. *Chapman*, 452 U. S. 337, 346–347 (1981); *Estelle* v. *Gamble*, 429 U. S. 97, 102–103 (1976). The Court's implication that prisoners have no possessory interests that by virtue of the Fourth Amendment are free from state interference cannot, in my view, be squared with the Eighth Amendment. To hold that a prisoner's possession of a letter from his wife, or a picture of his baby, has no protection against arbitrary or malicious perusal, seizure, or destruction would not, in my judgment, comport with any civilized standard of decency.

There are other substantive constitutional rights that also shed light on the legitimacy of Palmer's possessory interests.

439 U. S. 438, 441–443 (1979) *(per curiam); Bishop* v. *Wood,* 426 U. S. 341, 344, and nn. 6, 7 (1976); *Arnett* v. *Kennedy,* 416 U. S. 134, 165–166 (1974) (POWELL, J., concurring in part and concurring in result in part); *id.,* at 185 (WHITE, J., concurring in part and dissenting in part); *id.,* at 207–208 (MARSHALL, J., dissenting); *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972).

[12] See *Hewitt* v. *Helms,* 459 U. S. 460, 469–472 (1983); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S., at 11–12; *Wolff* v. *McDonnell,* 418 U. S. 539, 556–558 (1974).

The complaint alleges that the material at issue includes letters and legal materials. This Court has held that the First Amendment entitles a prisoner to receive and send mail, subject only to the institution's right to censor letters or withhold delivery if necessary to protect institutional security, and if accompanied by appropriate procedural safeguards.[13] We have also held that the Fourteenth Amendment entitles a prisoner to reasonable access to legal materials as a corollary of the constitutional right of access to the courts.[14] Thus, these substantive constitutional rights affirmatively protect Palmer's right to possess the material in question free from state interference. It is therefore beyond me how the Court can question the legitimacy of Palmer's possessory interests which were so clearly infringed by Hudson's alleged conduct.

## II

Once it is concluded that Palmer has adequately alleged a "seizure," the question becomes whether the seizure was "unreasonable." Questions of Fourth Amendment reasonableness can be resolved only by balancing the intrusion on constitutionally protected interests against the law enforcement interests justifying the challenged conduct.[15]

It is well settled that the discretion accorded prison officials is not absolute.[16] A prisoner retains those constitu-

---

[13] See *Procunier* v. *Martinez*, 416 U. S. 396 (1974). A prisoner's possession of other types of personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment. See *Cruz* v. *Beto*, 405 U. S. 319, 322, n. 2 (1972) *(per curiam)*.

[14] See *Bounds* v. *Smith*, 430 U. S. 817 (1977).

[15] See, *e. g.*, *United States* v. *Jacobsen*, 466 U. S. 109, 125 (1984); *Michigan* v. *Long*, 463 U. S. 1032, 1051 (1983); *United States* v. *Place*, 462 U. S., at 703; *Bell* v. *Wolfish*, 441 U. S., at 559.

[16] See *Bell* v. *Wolfish*, 441 U. S., at 562; *Procunier* v. *Martinez*, 416 U. S., at 405–406; *Cruz* v. *Beto*, 405 U. S., at 321–322 *(per curiam);* *Haines* v. *Kerner*, 404 U. S., at 520–521 *(per curiam).* See also *Rhodes* v. *Chapman*, 452 U. S. 337, 352 (1981); *id.*, at 368–369 (BLACKMUN, J., concurring in judgment); *Estelle* v. *Gamble*, 429 U. S. 97, 102–105 (1976);

548

tional rights not inconsistent with legitimate penological objectives.[17]  There can be no penological justification for the seizure alleged here.  There is no contention that Palmer's property posed any threat to institutional security.  Hudson had already examined the material before he took and destroyed it.  The allegation is that Hudson did this for no reason save spite; there is no contention that under prison regulations the material was contraband, and in any event as I have indicated above the Constitution prohibits a State from treating letters and legal materials as contraband.  The Court agrees that intentional harassment of prisoners by

*Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 866–870 (1974) (POWELL, J., dissenting).

[17] See *Bell* v. *Wolfish*, 441 U. S., at 545–547; *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119, 125, 129 (1977); *Wolff* v. *McDonnell*, 418 U. S., at 555–556; *Pell* v. *Procunier*, 417 U. S. 817, 822 (1974); *Procunier* v. *Martinez*, 416 U. S., at 412–414.  No precedent of this Court indicates that this general principle is inapplicable to the Fourth Amendment.  As the Court acknowledges, statements concerning the application of the Fourth Amendment to prisons in *Lanza* v. *New York*, 370 U. S. 139, 143–144 (1962), were dicta and were not joined by a majority of the Court.  See *ante*, at 524–525, n. 6.  I therefore do not understand why JUSTICE O'CONNOR seems to treat that case as an authoritative precedent, *ante*, at 538 (concurring opinion).  In *Bell* v. *Wolfish*, the Court explicitly reserved questions concerning prisoners' expectations of privacy and the seizure and destruction of prisoners' property.  See 441 U. S., at 556–557, and n. 38.  In *United States* v. *Edwards*, 415 U. S. 800 (1974), we approved "no more than taking from [an arrestee] the effects in his immediate possession that constituted evidence of crime," *id.*, at 805, and reserved decision on the question presented here, see *id.*, at 808, n. 9.  Conversely, when this Court last confronted the question decided today, it took it as given that the seizure of a prisoner's letters was subject to the Fourth Amendment:

"[T]he letters were voluntarily written, no threat or coercion was used to obtain them, nor were they seized without process.  They came into the possession of the officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution.  Under such circumstances there was neither testimony required of the accused, nor unreasonable search and seizure in violation of his constitutional rights." *Stroud* v. *United States*, 251 U. S. 15, 21–22 (1919).

guards is intolerable, *ante*, at 528. That being the case, there is no room for any conclusion but that the alleged seizure was unreasonable. The need for "close and continual surveillance of inmates and their cells," *ante*, at 527, in no way justifies taking and destroying noncontraband property; if material is examined and found not to be contraband, there can be no justification for its seizure. When, as here, the material at issue is not contraband it simply makes no sense to say that its seizure and destruction serve "legitimate institutional interests." *Ante*, at 528, n. 8. Such seizures are unreasonable.[18]

The Court's holding is based on its belief that society would not recognize as reasonable the possessory interests of prisoners. Its perception of what society is prepared to recognize as reasonable is not based on any empirical data; rather it merely reflects the perception of the four Justices who have joined the opinion that THE CHIEF JUSTICE has authored. On the question of what seizures society is prepared to consider reasonable, surely the consensus on that issue in the lower courts is of some significance. Virtually every federal judge to address the question over the past decade has concluded that the Fourth Amendment does apply to a prison cell.[19] There is similar unanimity among the com-

---

[18] It follows that I disagree with the premise on which JUSTICE O'CONNOR decides this case: "[I]f the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth Amendment concern." *Ante*, at 538–539 (concurring opinion). Hudson's infringement of Palmer's possessory interests was not reasonable. If we accept the allegations in the complaint as true—as we must—neither the act of taking possession nor the indefinite retention of these harmless noncontraband items would have been reasonable or justified by any legitimate institutional interest. Hudson took the property solely to harass Palmer.

[19] The Circuits which have addressed this question are unanimous. See, *e. g., Lyon* v. *Farrier*, 727 F. 2d 766, 769 (CA8 1984), cert. pending, No. 83–6722; *United States* v. *Mills*, 704 F. 2d 1553, 1560–1561 (CA11 1983), cert. denied, 467 U. S. 1243 (1984); *United States* v. *Chamorro*, 687 F. 2d 1, 4–5 (CA1), cert. denied, 459 U. S. 1043 (1982); *United States*

mentators.[20]   The Court itself acknowledges that "intentional harassment of even the most hardened criminals cannot be tolerated by a civilized society." *Ante,* at 528.   That being the case, I fail to see how a seizure that serves no purpose except harassment does not invade an interest that society considers reasonable, and that is protected by the Fourth Amendment.

---

v. *Hinckley,* 217 U. S. App. D. C. 262, 275–279, 672 F. 2d 115, 128–132 (1982); *United States* v. *Lilly,* 576 F. 2d 1240, 1245–1246 (CA5 1978); *United States* v. *Ready,* 574 F. 2d 1009, 1013–1014 (CA10 1978); *United States* v. *Stumes,* 549 F. 2d 831 (CA8 1977) *(per curiam); Bonner* v. *Coughlin,* 517 F. 2d 1311, 1315–1317 (CA7 1975), modified on other grounds, 545 F. 2d 565 (1976) (en banc), cert. denied, 435 U. S. 932 (1978); *Daugherty* v. *Harris,* 476 F. 2d 292 (CA10), cert. denied, 414 U. S. 872 (1973).   The Court claims that the Second and Ninth Circuits have reached a conclusion in accord with its own, see *ante,* at 522, n. 5, but both of the decisions it cites predated *Wolff* v. *McDonnell.*   Prior to *Wolff* many courts thought that no judicial review of prison conditions was possible. See generally Note, Constitutional Rights of Prisoners: The Developing Law, 110 U. Pa. L. Rev. 985 (1962); Note, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts, 72 Yale L. J. 506 (1963).   It is now the law in both Circuits that the Fourth Amendment protects prisoners against searches and seizures not reasonably related to institutional needs.   See *Hodges* v. *Stanley,* 712 F. 2d 34, 35 (CA2 1983) *(per curiam); DiGuiseppe* v. *Ward,* 698 F. 2d 602, 605 (CA2 1983); *United States* v. *Vallez,* 653 F. 2d 403, 406 (CA9), cert. denied, 454 U. S. 904 (1981); *Sostre* v. *Preiser,* 519 F. 2d 763 (CA2 1975); *United States* v. *Dawson,* 516 F. 2d 796, 805–806 (CA9), cert. denied, 423 U. S. 855 (1975); *Hansen* v. *May,* 502 F. 2d 728, 730 (CA9 1974); *United States* v. *Savage,* 482 F. 2d 1371, 1372–1373 (CA9 1973), cert. denied, 415 U. S. 932 (1974).

[20] See ABA Standards for Criminal Justice 23–6.10 Commentary (2d ed. 1980); Gianelli & Gilligan, Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities, 62 Va. L. Rev. 1045 (1976); Singer, Privacy, Autonomy, and Dignity in the Prison: A Preliminary Inquiry Concerning Constitutional Aspects of the Degradation Process in Our Prisons, 21 Buffalo L. Rev. 669 (1972); Note, Constitutional Limitations on Body Searches in Prisons, 82 Colum. L. Rev. 1033, 1043–1055 (1982); Comment, Electronic Surveillance in California Prisons after Delancie v. Superior Court: Civil Liberty or Civil Death?, 22 Santa Clara L. Rev. 1109 (1982).

The Court rests its view of "reasonableness" almost entirely upon its assessment of the security needs of prisons. *Ante,* at 527–528. Because deference to institutional needs is so critical to the Court's approach, it is worth inquiring as to the view prison administrators take toward conduct of the type at issue here. On that score the Court demonstrates a remarkable lack of awareness as to what penologists and correctional officials consider "legitimate institutional interests." I am unaware that any responsible prison administrator has ever contended that there is a need to take or destroy noncontraband property of prisoners; the Court certainly provides no evidence to support its conclusion that institutions require this sort of power. To the contrary, it appears to be the near-universal view of correctional officials that guards should neither seize nor destroy noncontraband property. For example, the Federal Bureau of Prisons' regulations state that only items which may not be possessed by a prisoner can be seized by prison officials, see 28 CFR §§ 553.12, 553.13 (1983). They also provide that prisoners can retain property consistent with prison management, specifically including clothing, legal materials, hobbycraft materials, commissary items, radios and watches, correspondence, reading materials, and personal photos.[21] Virginia law and its Department of Corrections' regulations similarly authorize seizure of contraband items alone.[22] I am aware of no prison

---

[21] See 28 CFR §§ 553.10, 553.11 (1983). The regulations also state: "Staff conducting the search shall leave the housing or work area as nearly as practicable in its original order." § 552.13(b). See also U. S. Dept. of Justice, Federal Standards for Prisons and Jails § 13.01 (1980) ("Written policy and procedure specify the personal property inmates can retain in their possession. . . . It should be made clear to inmates what personal property they may retain, and inmates should be assured both that the facility's policies are applied uniformly and that their property will be stored safely").

[22] See Va. Code § 53.1–26 (1982) ("Any item of personal property which a prisoner in any state correctional facility is prohibited from possessing by the Code of Virginia or by the rules of the Director shall, when found in the possession of a prisoner, be confiscated and sold or destroyed"); Virginia

552

system with a different practice;[23] the standards for prison administration which have been promulgated for correctional institutions invariably require prison officials to respect prisoners' possessory rights in noncontraband personal property.[24]

Depriving inmates of any residuum of privacy or possessory rights is in fact plainly *contrary* to institutional goals. Sociologists recognize that prisoners deprived of any sense of individuality devalue themselves and others and therefore are more prone to violence toward themselves or others.[25] At the same time, such an approach undermines the rehabilitative function of the institution: "Without the privacy and dignity provided by fourth amendment coverage, an inmate's opportunity to reform, as small as it may be, will further be diminished. It is anomalous to provide a prisoner with rehabilitative programs and services in an effort to build self-respect while simultaneously subjecting him to unjustified and degrading searches and seizures." Gianelli & Gilligan, Prison Searches and Seizures: "Locking" the Fourth Amendment Out of Correctional Facilities, 62 Va. L. Rev. 1045, 1069 (1976).

To justify its conclusion, the Court recites statistics concerning the number of crimes that occur within prisons. For example, it notes that over an 18-month period approxi-

Department of Corrections, Division of Adult Services, Guideline No. 411 (Sept. 16, 1983).

[23] For example, the Illinois regulation considered in *Bonner* v. *Coughlin,* 517 F. 2d, at 1314, n. 6, provided: "It is important and essential that searches be systematic and do not result in damage, loss, or abuse to any inmate's personal property. Deliberately damaging, confiscating, or abusing any inmate's permitted personal property will result in disciplinary action against the offending employee."

[24] See ABA Standards for Criminal Justice 23–6.10 (2d ed. 1980); American Correctional Association, Standards for Adult Correctional Institutions 2–4192 (2d ed. 1981); National Advisory Commission on Criminal Standards and Goals, Corrections 2.7 (1973).

[25] A summary of the literature is found in Schwartz, *Deprivation of Privacy as a "Functional Prerequisite": The Case of the Prison, 63 J. Crim. L., C. & P. S. 229 (1972).

mately 120 prisoners were murdered in state and federal facilities. *Ante,* at 526. At the end of 1983 there were 438,830 inmates in state and federal prisons.[26] The Court's homicide rate of 80 per year yields an annual prison homicide rate of 18.26 persons per 100,000 inmates. In 1982, the homicide rate in Miami was 51.98 per 100,000; in New York it was 23.50 per 100,000; in Dallas 31.53 per 100,000; and in the District of Columbia 30.70 per 100,000.[27] Thus, the prison homicide rate, it turns out, is significantly lower than that in many of our major cities. I do not suggest this type of analysis provides a standard for measuring the reasonableness of a search or seizure within prisons, but I do suggest that the Court's use of statistics is less than persuasive.[28]

The size of the inmate population also belies the Court's hypothesis that all prisoners fit into a violent, incorrigible stereotype. Many, of course, become recidivists. But literally thousands upon thousands of former prisoners are now leading constructive law-abiding lives.[29] The nihilistic tone

---

[26] U. S. Dept. of Justice, Bureau of Justice Statistics, Prisoners in 1983 (Apr. 1984).

[27] See U. S. Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States—1982, pp. 51, 65, 70, 92 (1983).

[28] The size of the prison population also sheds light on what society may consider reasonable with respect to the property and privacy of prisoners. When one recognizes that the prison population is constantly changing and that most inmates have family or friends who retain an interest in their well-being, one must acknowledge that millions of citizens may well believe that prisoners should retain some residuum of privacy and possessory rights.

[29] The Court's portrayal of the stereotypical prison inmate entirely overlooks the wide range of individuals who actually have served and do serve time in the prison system. It ignores, for example, the conscientious objectors who refuse to register for the draft, and the corporate executives who have been convicted of violating securities, antitrust, or tax laws, union leaders, former White House aides, former Governors, judges, and legislators, famous writers and sports heroes, and many thousands who have committed serious offenses but for whom crime is by no means a way of life.

of the Court's opinion—seemingly assuming that all prisoners have demonstrated an inability "to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint," *ante,* at 526, is consistent with its conception of prisons as sterile warehouses, but not with an enlightened view of the function of a modern prison system.[30]

In the final analysis, however, any deference to institutional needs is totally undermined by the fact that Palmer's property was not contraband. If Palmer were allowed to possess the property, then there can be no contention that any institutional need or policy justified the seizure and destruction of the property. Once it is agreed that random searches of a prisoner's cell are reasonable to ensure that the cell contains no contraband, there can be no need for seizure and destruction of noncontraband items found during such searches. To accord prisoners any less protection is to declare that the prisoners are entitled to no measure of human dignity or individuality—not a photo, a letter, nor anything except standard-issue prison clothing would be free from arbitrary seizure and destruction. Yet that is the view the

---

[30] I cannot help but think that the Court's holding is influenced by an unstated fear that if it recognizes that prisoners have any Fourth Amendment protection this will lead to a flood of frivolous lawsuits. Of course, this type of burden is not sufficient to justify a judicial modification of the requirements of law. See *Tower* v. *Glover,* 467 U. S. 914, 922–923 (1984); *Patsy* v. *Florida Board of Regents,* 457 U. S., at 512, n. 13. "Frivolous cases should be treated as exactly that, and not as occasions for fundamental shifts in legal doctrine. Our legal system has developed procedures for speedily disposing of unfounded claims; if they are inadequate to protect [defendants] from vexatious litigation, then there is something wrong with those procedures, not with the [Fourth Amendment]." *Hoover* v. *Ronwin,* 466 U. S. 558, 601 (1984) (STEVENS, J., dissenting) (footnote omitted). In fact, the lower courts have permitted such suits to be brought for some time now, see n. 19, *supra,* without disastrous results. Moreover, costs can be awarded against the plaintiff when frivolous cases are brought, see 466 U. S., at 601, n. 27. Even modest assessments against prisoners' accounts could provide an effective weapon for deterring truly groundless litigation.

Court takes today. It declares prisoners to be little more than chattels, a view I thought society had outgrown long ago.

## III

By adopting its "bright line" rule, the Court takes the "hands off" approach to prison administration that I thought it had abandoned forever when it wrote in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974):

> "[T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Id.*, at 555–556.

The first Clause of the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." Today's holding means that the Fourth Amendment has no application at all to a prisoner's "papers and effects." This rather astonishing repeal of the Constitution is unprecedented;[31] since *Wolff* we have consistently followed its command that "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Id.*, at 556.[32]

Today's holding cannot be squared with the text of the Constitution, nor with common sense. The Fourth Amendment is of "general application," and its text requires that

---

[31] The Court's repeal does appear to extend to less than the entire Amendment. It appears to limit its holding to a prisoner's "papers and effects" located in his cell. Apparently it believes that at least a prisoner's "person" is secure from unreasonable search and seizure. See *Bell* v. *Wolfish*, 441 U. S., at 563 (POWELL, J., concurring in part and dissenting in part).

[32] See cases cited, nn. 16, 17, *supra.*

every search or seizure of "papers and effects" be evaluated for its reasonableness. The Court's refusal to inquire into the reasonableness of official conduct whenever a prisoner is involved—its conclusive presumption that all searches and seizures of prisoners' property are reasonable—can be squared neither with the constitutional text, nor with the reality, acknowledged by the Court, that our prison system is less than ideal; unfortunately abusive conduct sometimes does occur in our prisons.

More fundamentally, in its eagerness to adopt a rule consistent with what it believes to be wise penal administration, the Court overlooks the purpose of a written Constitution and its Bill of Rights. That purpose, of course, is to ensure that certain principles will not be sacrificed to expediency; these are enshrined as principles of fundamental law beyond the reach of governmental officials or legislative majorities.[33] The Fourth Amendment is part of that fundamental law; it represents a value judgment that unjustified search and seizure so greatly threatens individual liberty that it must be forever condemned as a matter of constitutional principle.[34]

---

[33] "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 638 (1943).

[34] "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the signficance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the indi-

The courts, of course, have a special obligation to protect the rights of prisoners.[35] Prisoners are truly the outcasts of society. Disenfranchised, scorned and feared, often deservedly so, shut away from public view, prisoners are surely a "discrete and insular minority."[36] In this case, the destruction of Palmer's property was a seizure; the Judiciary has a constitutional duty to determine whether it was justified. The Court's conclusive presumption that all conduct by prison guards is reasonable is supported by nothing more than its idiosyncratic view of the imperatives of prison administration—a view not shared by prison administrators themselves. Such a justification is nothing less than a decision to sacrifice constitutional principle to the Court's own assessment of administrative expediency.

More than a decade ago I wrote:

"[T]he view once held that an inmate is a mere slave is now totally rejected. The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual.

---

vidual, by whatever the means employed, must be deemed a violation of the Fourth Amendment." *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

[35] See *Rhodes* v. *Chapman,* 452 U. S. 337, 358–361 (1981) (BRENNAN, J., concurring in judgment); *id.,* at 369 (BLACKMUN, J., concurring in judgment); *United States* v. *Bailey,* 444 U. S. 394, 423–424 (1980) (BLACKMUN, J., dissenting).

[36] See *Bernal* v. *Fainter,* 467 U. S. 216, 222, n. 7 (1984); *Toll* v. *Moreno,* 458 U. S. 1, 23 (1982) (BLACKMUN, J., concurring); *O'Bannon* v. *Town Court Nursing Center,* 447 U. S. 773, 800, n. 8 (1980) (BLACKMUN, J., concurring in judgment); *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 313 (1976) *(per curiam); Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 102, and n. 22 (1976); *Graham* v. *Richardson,* 403 U. S. 365, 372 (1971); *Oregon* v. *Mitchell,* 400 U. S. 112, 295, n. 14 (1970) (Stewart, J., concurring in part and dissenting in part); *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–153, n. 4 (1938).

'Liberty' and 'custody' are not mutually exclusive concepts." *United States ex rel. Miller* v. *Twomey*, 479 F. 2d 701, 712 (CA7 1973) (footnotes omitted), cert. denied *sub nom. Gutierrez* v. *Department of Public Safety of Illinois*, 414 U. S. 1146 (1974).

By telling prisoners that no aspect of their individuality, from a photo of a child to a letter from a wife, is entitled to constitutional protection, the Court breaks with the ethical tradition that I had thought was enshrined forever in our jurisprudence.

Accordingly, I respectfully dissent from the Court's judgment in No. 82–1630 and from Part II–A of its opinion.