Vincent R. DeSIMONE, Plaintiff,

v.

**BOARD OF EDUCATION, SOUTH HUNTINGTON UNION FREE SCHOOL DISTRICT and Marie Connelly, Defendants.**

**No. CV 83–5296.**

United States District Court, E.D. New York.

July 12, 1985.

Block & Hamburger by Frederic Block, Smithtown, N.Y., for plaintiff.

Jaspan, Ginsberg, Ehrlich, Reich & Levine by Lawrence Reich, Garden City, N.Y., for defendant Bd. of Educ.

Paul Derkash, Plainview, N.Y., for defendant Connelly.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an action under 42 U.S.C. § 1983. Our previous opinion in this case is reported at 604 F.Supp. 1180.

### I. FACTS

On May 11, 1983 defendant Board of Education abolished plaintiff's position of High School Dean, effective June 30, 1983. At the same time, the Board established a new position of High School Administrative Assistant. On May 12, 1983, the Superintendent of Schools for the district informed plaintiff of the abolition of his position, and also informed plaintiff that he would not be offered new employment for the term starting September 1983. Plaintiff is a tenured teacher under N.Y. Education Law § 3012(2). Under Education Law § 2510(2), "whenever a board of education abolishes a position ... the services of the teacher having the least seniority in the system within the tenure of the position abolished shall be discontinued." Under § 2510(1), "if the board of education abolishes an office or position and creates another office or position for the performance of duties similar to those performed in the office or position abolished, the person filling such office or position at the time of its abolishment shall be appointed to the office or position thus created ..." Plaintiff contends that the new position of Administrative Assistant is essentially equivalent to plaintiff's old position of Dean, and that the discontinuance of plaintiff's services without a hearing on the issue of the similarity of the positions constituted a deprivation of property without due process in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

## II. THE DUE PROCESS CLAUSE REQUIRED A PRE–TERMINATION HEARING

 Without at this time determining whether the two positions were "similar" within the meaning of Education Law § 2510(1), we note that documents submitted to the Court indicate that the positions were similar in many respects. The new position of Administrative Assistant involved all of the disciplinary functions previously performed by plaintiff as Dean. The new position, like the old position, involved responsibility for one of the two wings of the school. The new position also involved some administrative functions not involved in the old position. Appended to this opinion are the "position guides" for the two positions. Given the similarity of the positions, we believe that it is clear that a reasonable person contemplating the abolition of the position of Dean and the creation of the position of Administrative Assistant would have been alerted to the substantial *possibility* that plaintiff would be legally entitled to occupy the new position of Administrative Assistant pursuant to Education Law § 2510(1). The question then arises of whether, under these circumstances, the Due Process Clause of the Fourteenth Amendment required the Board to provide plaintiff with some kind of hearing before discontinuing plaintiff's services.

The Supreme Court recently decided the case of *Cleveland Bd. of Educ. v. Loudermill,* —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). There, a city Board of Education dismissed a guard for alleged dishonesty in filling out a job application. Although it was undisputed that the guard had incorrectly stated on the application that he had never been convicted of a felony, the Court held that the Board was constitutionally required to give the guard a pre-termination opportunity to respond, in order to enable the guard to demonstrate that the guard had mistakenly thought that he had been convicted of a misdemeanor, and to invoke the discretion of the Board.

The Court noted that "the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood ... While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." 105 S.Ct. at 1494.

Without annunciating a comprehensive theory regarding the circumstances in which the Due Process Clause of the Fourteenth Amendment would require a hearing prior to the discontinuance of a teacher's services pursuant to Education Law § 2510(2), we hold that in the instant case the Due Process Clause required such a pre-termination hearing.

First, in the instant case, as in *Loudermill*, plaintiff has been deprived of the means of his livelihood. Although the Board may ultimately appoint plaintiff to some other position, it is speculative when this will occur, if at all. Although the plaintiff (unlike the plaintiff in *Loudermill*), has not been stigmatized, this fact is hardly a point in the Board's favor. It would be paradoxical if an employee whose honesty had been put in doubt by a prima facie showing of dishonesty (such as the plaintiff in *Loudermill* ) were entitled to more rights than an employee whose integrity and competence were unquestioned (such as the instant plaintiff). The fact that the instant plaintiff's integrity and competence are unquestioned tends to weigh in favor of a finding that the Board had little reason to discontinue plaintiff's services without a pre-termination hearing.

Second, as we have held, plaintiff's old position and the newly created position were sufficiently similar that the Board knew or should have known that there was substantial *possibility* that plaintiff might possess a substantive right under Education Law § 2510(1) to occupy the new position. Since the Board should have recognized this possibility, it is not unreasonable to hold that the Due Process Clause required the Board to provide plaintiff with a pre-termination hearing.

Third, the question of whether two positions which are *arguably* "similar" within the meaning of Education Law § 2510(1) are *in reality* "similar" within the meaning of § 2510(1) is a question which is not readily reducible to pure questions of law. While we have previously in the instant case expressed doubt that the Due Process Clause requires a hearing regarding pure questions of law, 604 F.Supp. at 1183; *see Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984), the question involved in the instant case is of a type traditionally classified as a mixed question of law and fact. The Supreme Court appears to have adopted a liberal view of the circumstances requiring a hearing. *See Loudermill,* 105 S.Ct. at 1494 n. 8. We are therefore inclined to believe that a hearing was constitutionally required in the instant case.

### III. REMEDY

The question arises as to the remedy for the Board's deprivation of plaintiff's property without due process.

█ When official policy results in a person being deprived of property or liberty without procedural due process, and such deprivation would have taken place even if a proper hearing had been held, then the person is not entitled to compensatory damages for the deprivation itself. *Carey v. Piphus,* 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978). The person is entitled only to nominal damages for the denial of due process, *id.,* 435 U.S. at 266–267, 98 S.Ct. at 1053–1054, unless the person demonstrates actual injury attributable to the *denial of due process* rather than to the *deprivation, id.,* 435 U.S. at 263, 98 S.Ct. at 1052.

█ In the instant case, we have held that the Board deprived plaintiff of property without procedural due process by discontinuing plaintiff's services without a pre-termination hearing. However, we have not determined (and cannot determine from the papers submitted) whether plaintiff's old position is "similar" to the newly created position within the meaning of Education Law § 2510(1). We therefore cannot

determine whether plaintiff's services would have been discontinued had the Board provided a pre-termination hearing. We therefore cannot determine whether plaintiff is entitled to compensatory damages for the loss of his job. A trial will therefore be necessary. If it is determined at trial that plaintiff's old position and the newly created position were not "similar" within the meaning of Education Law § 2510, then plaintiff will be entitled only to nominal damages, unless plaintiff demonstrates injury (such as mental distress) attributable *not* to plaintiff's loss of his job but *rather* to the denial of a hearing.

## IV. PULLMAN ABSTENTION

The Board has argued that we should abstain from hearing this case pursuant to *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), which holds that a federal district court should abstain from ruling upon federal constitutional issues which might be rendered moot or placed in a different posture by state court determination of pertinent law.

■ The Board argues that state law regarding the meaning of "similar" under Education Law § 2510(1) is unclear. As we have stated, the question of whether two positions which are *arguably* "similar" under § 2510(1) are *in reality* "similar" under § 2510(1) is a question of a type traditionally classified as a mixed question of law and fact. As we have previously suggested in the instant case, 604 F.Supp. at 1185, *Pullman* abstention is inappropriate for mixed questions of law and fact. *See also Vinyard v. King*, 655 F.2d 1016, 1019 (10th Cir.1981).

■ The Board also notes that this Court has previously questioned whether state law required a pre-termination hearing. 604 F.Supp. at 1184. The Board argues that plaintiff's federal claims would be rendered moot if a state court determined that state law required a pre-termination hearing. However, whether state law required a pre-termination hearing is irrelevant to plaintiff's federal claims under the Due Process Clause and 42 U.S.C. § 1983. The fact that state officials violat-ed state law generally does not preclude a suit for damages under § 1983, as the federal remedy is supplementary to the state remedy, *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). An exception to this rule is made where state officials committed random unauthorized deprivations of property, *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer*, — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *perhaps* also where state officials committed random unauthorized deprivations of liberty, *but see Conway v. Village of Mount Kisco*, 758 F.2d 46, 48 (2d Cir.1985); *Farrell v. Miklas*, 605 F.Supp. 202 (E.D.N.Y.1985) (Wexler, J.). In the instant case, the deprivation of property was committed by a Board of Education and was therefore not "random and unauthorized", even if the deprivation may have violated state law, so that a § 1983 action is not barred. We have previously stated this. 604 F.Supp. at 1183. Consequently, state court determination of whether state law required a pre-termination hearing could not render plaintiff's § 1983 claim moot. *Pullman* abstention is therefore inappropriate.

## V. BURFORD ABSTENTION

■ The Board has not argued for abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, which holds that abstention is appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar. If our resolution of the instant case were likely to result in frequent federal court litigation regarding the "similarity" of positions within the meaning of Education Law § 2510(1), we might well apply "Burford" abstention. However, we regard this as unlikely. We have held that the Due Process Clause of the Fourteenth Amendment requires that a Board of Education provide a tenured teacher with a hearing before discontinuing such teacher's services under Education Law § 2510(2), at least in those situations in which the Board knows or should know

that there is a substantial possibility that the teacher may have a substantial right under § 2510(1) to occupy a newly created position. In future, we expect that boards of education will provide such pre-termination hearings in such situations, thereby greatly reducing the likelihood of further federal court involvement in the interpretation of § 2510(1). *Burford* abstention is therefore inappropriate.

## VI. SUPPLEMENTARY REMARKS

Before closing this opinion, we have a number of comments to make.

In *McDonald v. City of West Branch, Mich.,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) the Court held that an unappealed arbitration award cannot be given res judicata or collateral estoppel effect in a § 1983 action. In the instant case, it is quite possible that plaintiff had available to him the remedy of binding arbitration pursuant to state contract law. While we are bound by the Court's holding and therefore recognize that the availability of arbitration does not bar a § 1983 action, we respectfully disagree with the Court. We believe that where government employees have bargained for the creation of an arbitration procedure, there is nothing unjust in requiring such employees to pursue arbitration rather than a § 1983 action. Arbitrators will have far greater expertise in employment disputes and state civil service law than federal judges or jurors. Further, we believe that the Congress which enacted § 1983 in its original form in 1871 had no intention that the statute be given a scope anywhere near as sweeping as that currently given it through judicial interpretation. The primary purpose of the statute was to protect blacks against discriminatory Southern laws and actions by officials.

The Supreme Court has held that where state law has created substantive property or liberty interests, the Due Process Clause of the Fourteenth Amendment sets certain requirements concerning the minimum amount of procedure necessary to destroy such interests, requirements not necessarily derived from the legislation creating the underlying substantive interests. *Loudermill,* 105 S.Ct. at 1492–1493; *Vitek v.*

*Jones,* 445 U.S. 480, 490–491, 100 S.Ct. 1254, 1262–1263, 63 L.Ed.2d 552 (1980). The Court has rejected the contrary view of Justice Rehnquist (joined by Chief Justice Burger and Justice Stewart) in the plurality opinion in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Justice Rehnquist reasoned that where a government could legally choose not to confer a substantive right in the first place, it follows *a fortiori* that the government may choose (at the time of creating the substantive right) to establish the procedures by which the substantive right may be taken away. We have serious doubts as to whether Justice Rehnquist's reasoning could properly be applied to such traditional forms of property as private ownership of land. We believe that there may be constitutional limitations upon the power of the states to radically alter the traditional substantive law concerning the acquisition of such traditional forms of property, and therefore doubt the existence of an unlimited "lesser included power" of radically altering the traditional procedures by which such property may be taken away. However, tenured public employment is a modern phenomenon which was virtually non-existent at the time the Fourteenth Amendment was ratified. The decision by a state of whether to create a system of tenure for its employees is wholly discretionary with the state. Consequently, we respectfully disagree with the Supreme Court and believe that a government which confers tenure upon its employees ought to have the right to set the procedures by which such employees may be discharged.

The instant case is a perfect illustration of the difficulties which arise from the view that state law controls substance while federal law controls procedure.

In order to determine whether a plaintiff has been deprived of a substantive property interest *without due process,* we must, of course, generally determine whether the plaintiff has been deprived of a substantive property interest. This in turn involves a determination of state substantive law regarding the acquisition and loss of proper-

ty. In cases involving traditional forms of property, this is usually not too difficult. In cases such as the instant case, however, the distinction between substance and procedure and between law and fact inevitably becomes blurred due to the absence of guidance from history and tradition. This problem could be readily resolved by holding that the state provides all the process which is "due" when the state provides the process which was guaranteed in the legislation creating the alleged underlying substantive interest. This course has been barred to us by the Supreme Court. As a result, it is only with great difficulty that we have determined that the Board has deprived plaintiff of property without due process. Further difficulty will be involved in the determination by a jury instructed by this Court as to whether the plaintiff would have been discontinued had a proper hearing been held.

## VII. CONCLUSION

Plaintiff is granted partial summary judgment on the issue of liability. The Clerk shall not enter judgment at this time, as a trial will be held to determine whether plaintiff is entitled to compensatory damages or only nominal damages, and to determine the amount of damages.

SO ORDERED.

### EXHIBIT B

### SOUTH HUNTINGTON UNION FREE SCHOOL DISTRICT

Huntington Station, New York
POSITION GUIDE

TITLE: High School Administrative Assistant

I. *Basic Function*

The high school administrative assistant provides assistance to the assistant principals in the operation of the building.

II. *Principal Activities*

1. The administrative assistant is responsible for overall student discipline within the assigned wing. The administrative assistant keeps the principal and the assistant principals apprised of the general disciplinary situation through anecdotal and oral reports, and recommends the disposition of student suspensions, parental conferences, delinquency referrals, and other disciplinary actions necessary for the maintenance of school efficiency and morale.

2. The administrative assistant is responsible for the routine administration of the building in the absence of the principal and the assistant principals.

3. The administrative assistant shares in the supervision of the staff in areas relating to student behavior and discipline.

4. The administrative assistant shares in the supervision of the physical plant.

5. The administrative assistant provides close liaison between the district transportation office and the school.

6. The administrative assistant shares the responsibility for emergency class coverage during the school day.

7. The administrative assistant shares in the securing of substitutes.

8. The administrative assistant shares in the organization and supervision of school assembly programs.

9. The administrative assistant shares in the orientation of instructional staff.

10. The administrative assistant is responsible for the supervision and publication of the daily absentee bulletin.

11. The administrative assistant is responsible for the coordination of staff assigned to cafeteria supervision and the development of cafeteria rules and regulations.

12. The administrative assistant is responsible for the registration of student vehicles.

13. The administrative assistant shares in the planning and execution of the extra-curricular program.
14. The administrative assistant attends administrative meetings and evening activities.
15. The administrative assistant shares in end-of-the-year and graduation plans.
16. The administrative assistant shares in the supervision of security personnel.
17. The administrative assistant maintains a close liaison with individual staff members and social agencies regarding truancy and other anti-social student behavior.

## III. *Guidelines*

1. The administrative assistant, as a member of the building administrative team, is responsible to the principal and the assistant principals.
2. Specific additional responsibilities will be assigned as needed by the principal.
3. This is a ten-month position, from September 1 through June 30. The salary is based on the Administrative Salary Schedule as determined in the Memorandum of Understanding with the SHAA and the Superintendent of Schools.

## EXHIBIT C

## POSIITON GUIDE

TITLE: Dean—Walt Whitman High School

I. *Basic Function:* In all school situations and relationships affecting the behavior of students, the dean is expected to assume responsibility for enforcing and upholding the procedures, rules and regulations outlined in the teacher handbook, student handbook and administrative memoranda.

II. *Principal Activities:*

1. Publish the Daily Absentee Report for the use of teachers and attendance office.

2. He is charged with the responsibility of student discipline and in this capacity assumes supervisory authority in matters involving student behavior in the school.
3. Maintain an up-to-date cumulative record on each student referred.
4. Distribute formal reports of infractions to teachers and counselors involved and to the principal.
5. Assume responsibility for organizing the staff members assigned to cafeteria supervision. The dean is to develop procedures, rules and regulations for administering the cafeteria.
6. Supervise the system for apprehending students who are illegally absent from class.
7. Supervise the daily detention hall, Monday through Thursday, from 2:30 p.m. to 3:45 p.m.
8. Registration of all student vehicles is a responsibility of the dean's office. Violation of traffic rules is treated as a discipline matter.
9. Notify and when necessary, meet with the parents of students who are referred for serious infractions.
10. Maintain a close liaison with counselors, psychologist, social worker, nurses, attendance office, administrators and teachers.
11. Cooperate with local police authorities.
12. In all situations involving the behavior of students, the dean is to assume those responsibilities which will in effect support the procedures, rules and regulations which have been developed by the professional staff.

III. *Primary Relationship:*

1. The dean is responsible directly to the South Administrator or to the North Administrator depending on his assignment.

IV. *Employment Terms:*

1. This position is a 10–month position with placement on the teachers' salary schedule. Additional compensation

will be commensurate with extra duties and responsibilities.

P.O. 4/2/73