**AFFIRM; Opinion Filed July 2, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00728-CR

**DOMINIQUE WOODBERRY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F17-52253-U**

# MEMORANDUM OPINION
Before Chief Justice Burns, Justices Myers, and Carlyle
Opinion by Justice Carlyle

Dominique Woodberry appeals his conviction for possessing a controlled substance with intent to deliver. He raises four issues on appeal: (1) whether the trial court abused its discretion by denying his motion to suppress certain evidence obtained through the execution of a search warrant; (2) whether the evidence was sufficient to prove he possessed the drugs found during the search; (3) whether the trial court abused its discretion by admitting recordings of certain jailhouse phone calls over his foundational objections; and (4) whether the trial court was required to suppress the recordings because they violated his constitutional right to privacy. We affirm and, because the legal issues are settled, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

## I. Background

After receiving multiple anonymous complaints about a house located at 2615 Lenway Street in Dallas and one "Big Boi" (a nickname for Woodberry), the Dallas Police Department's narcotics division began investigating. Lead detective Michael Bono went to 2615 Lenway, a "yellow stonewash" duplex with a cage on the front door. After additional investigation, he organized a "knock-and-talk operation"—an attempt by uniformed police to investigate through consensual contact with a person at the residence.

Bono soon attempted the knock-and-talk with other officers. As Bono approached the duplex, he sensed a "loud odor of . . . marijuana emitting from the area." As the officers got to the door, the odor "became more . . . loud and noticeable." The officers knocked on the door numerous times before a woman, later identified as Woodberry's girlfriend Kadejah Lane, answered. She opened the door (with the cage still closed), and according to Bono, the officers "could definitely smell unburned marijuana emitting from the direction of that open door." Although Lane declined to open the cage door, the officers got a close-up view of a small hinged doorway within the larger cage door, "just large enough for a human hand to go in and out," which they noted was consistent with use in drug sales.

After this, officers began conducting surveillance. As part of that surveillance, they observed what appeared to be numerous transactions consistent with drug sales. They observed individuals parking their cars in front and walking to the doorway. Sometimes the individuals would be allowed inside the house for one or two minutes before returning to their vehicles and leaving. Other times, the officers would observe people engaging in hand-to-hand transactions through the hand-sized hinged doorway within the cage door.

Eventually, after an unsuccessful attempt to purchase drugs through a confidential informant, the officers decided to follow one of the people they observed participating in what

appeared to be a drug sale at the duplex. After that individual, Vaughn Sanders, walked sufficiently out of range of the duplex, they conducted a pedestrian stop, Sanders consented to a search, and they found crack cocaine in his possession. Sanders admitted buying crack cocaine at the duplex on a daily basis.

Bono applied for a search warrant for the left side of the duplex on February 11, 2017. In his affidavit, he described the duplex as having a "tan colored stone face" and, among other things, attested that: (1) he was investigating the duplex after receiving a complaint about drug sales; (2) there was a strong odor of unburnt marijuana observed by officers coming from within the duplex during the attempted knock-and-talk; (3) there was a small hatch cut into the caged entry door; (4) officers observed numerous suspected drug transactions taking place at the duplex; (5) officers witnessed Sanders participate in a suspected drug sale through the small hatch in the caged entry door; (6) officers followed and stopped Sanders after the transaction; (7) a search of Sanders revealed he was in possession of crack cocaine; (8) Sanders admitted purchasing crack cocaine at the duplex daily; and (9) Sanders described the duplex "in detail (the street name, color of the structure, and style of residence)" in addition to identifying it on a printed "google streets image."

A no-knock search warrant was issued based on Bono's affidavit, and officers executed that warrant on February 14, 2017. As the officers attempted to enter, however, Woodberry's brother, Frank Murray, began firing at them from the left side of the duplex. As Murray was shooting, Woodberry attempted to flee via the rear of the duplex, but he retreated back into the house after he was confronted by an officer covering the rear perimeter.[1] Police called a SWAT team to secure the scene, and nine suspects eventually came out of the right side of the duplex after

---

[1] Woodberry was identified at trial as the person who tried to exit the rear of the duplex, though the testifying officer's post-incident affidavit said the suspect appeared to have dreadlocks. Woodberry did not have dreadlocks at the time.

officers "loud hailed" them, demanding that they exit. Woodberry and Murray were among the nine suspects.

The SWAT team secured the area and determined there were no suspects remaining in the duplex. A search of the duplex later revealed, among other things, a .40 caliber semiautomatic pistol in the attic, which was accessible only from the right side of the duplex.[2] It had an empty 14-round magazine with one unfired round in its chamber. Officers also found 14 spent .40 caliber cartridge casings on the left side of the duplex, and subsequent analysis determined the casings were fired by the pistol found in the attic. In addition, officers found a revolver with shell casings containing Woodberry's DNA, and subsequent testing confirmed Woodberry had gunshot residue on his hands at the time of the raid.[3] This led to three possibilities: (1) Woodberry had fired a gun; (2) he was in close proximity to a gun when it was fired; or (3) he touched an object with gunshot residue on it.

During their search in the left side of the duplex, officers recovered 70.3 grams of cocaine (both crack and powder), 1,937.3 grams of marijuana, packaging, digital scales, and $1,683 in cash. With respect to the cocaine, there were individual packages, unpackaged crack cocaine, and a larger "cookie" of crack cocaine. A portion of the cash recovered was comingled with individual drug packages. This was all consistent with drug sales.

In addition, officers recovered two Pyrex measuring cups and a set of keys. The Pyrex cups tested positive for cocaine, and one of the cups, which contained a makeshift whisk, had Woodberry's finger and palm prints on it. A witness explained that the whisk and measuring cups were consistent with the process for making crack cocaine from powder cocaine. The set of keys the officers found contained keys to the front door of the duplex, the cage over the door, and a

_____

[2] Police conducted the search for firearms in the right side of the duplex under a second search warrant signed the night of the raid.

[3] Each of the individuals who came out of the duplex, including Woodberry and Murray, tested positive for gunshot residue.

1998 Dodge Ram pickup parked in the duplex's driveway. That pickup was registered to Woodberry, and a current insurance card found in the truck identified both Woodberry and his mother as drivers.

Two cell phones seized during the raid were linked to a Google account under Woodberry's name. One of the phones, which was taken off Woodberry, included messages sent up to the date and time of the raid. Messages were directed to "Dominique" or "bigboi," and a text from the phone said, "this dude from earlier bigboi."

Numerous texts sent to and from Woodberry's phone appeared to reference drug sales. For example, texts asked about the prices of "grass," "kush," and "corn," which trial testimony explained were slang terms for marijuana. Two weeks before the raid, a text was sent from Woodberry's phone to Murray, asking "Wer u put the money for last nite on d's soft," which trial testimony explained was Woodberry asking where Murray put the money from a cocaine sale the previous night. A few weeks before that, a text from Woodberry's phone appears to have acknowledged owing money "for the biscuit," which a witness explained was in reference to a "cookie" of crack cocaine. Further, both videos and photos extracted from Woodberry's phone linked him to the duplex and to drug activities taking place there. In fact, one of the photos extracted from the phone showed the same "cookie" of crack cocaine seized during the raid.

The day after the raid, Bono signed a return and inventory listing the cocaine, marijuana, cash, assorted mail, and two smartphones seized by the officers. The return did not, however, list the two Pyrex cups or the guns seized during the raid.

Following his arrest, Woodberry was taken to the county jail. Inmates at the jail were warned their phone calls would be recorded. Nevertheless, Woodberry made several phone calls in which he made potentially incriminating statements. In one call, Woodberry identified himself as "Big Boi" and explained that he thought someone named "Black E" was responsible for getting

him "jammed up." According to Woodberry, "Black E came over there and got the kush twice bro." The other person on the call cut Woodberry off: "Hey, hey, hey! I don't wanna hear nothin about that right now. . . . I don't want to talk about all that on the phones. They're going to try to use all that against you." Woodberry responded: "Yeah, yeah, yeah, yeah, but I'm saying man . . . ." Later in the call, Woodberry expressed concern about "the whole empire going down" if they did not take care of things.

In one call to Lane, Woodberry speculated that Murray might have "served to an undercover." He also explained that "when the law was coming in," Murray "started dumping on them hoes." He criticized Murray for "admit[ing] to the shit" and said that Murray did not need to admit to "dumping on, at the laws" because he (Woodberry) "took care of the situation like the situation was supposed to be took care of." Trial testimony explained that "dumping" referred to "shooting," which in context meant that Woodberry expressed frustration that Murray had admitted shooting at the police. Woodberry also expressed regret that he had parked his truck outside the duplex: "I'd been parking my truck . . . at your [grandmother's] house, . . . I don't know why I pulled that truck back up into the yard." Nevertheless, Woodberry was optimistic: "I really could beat the case, because they didn't catch me with nothing."

In another call with Lane, Woodberry again speculated that "Black E" could have informed against him:

> [T]he only thing I did different [the day of the raid]? You want to know what I did different? Man, that . . . Black E came up over there . . . . I smoked a blunt with [him]. We choppin it up, we choppin it up. He come back . . . later in the day to grab some kush right? . . . And then that shit happened. Almost kind of feels like– man–I'm looking at his ass too, you hear me?

In the same call, Woodberry described what happened during the raid:

> [Murray] lucky he still alive. Shit, hell. [Murray] started busting. Them hoes aired the house out. But the crazy thing about it is them hoes were so scared. . . . I looked up out the window, them hoes . . . was in front of the, you know how the truck be pointing backwards? . . . Them hoes went from the porch all the way back to the

what's her name. If I was thinking I really could've just grabbed up all the shit, but I was panicking so much 'cause they just got through shooting and shit.

Finally, in a third call to Lane, Woodberry explained that his focus during the raid was on protecting Murray:

Next thing [I] know, [Murray] start shooting. . . . Then I just hit the ground . . . the laws they got so scared, they got in front of my truck and was hiding. . . . Crazy thing about it though is I didn't pick up no money. I was panicking so bad, trying to get [Murray] out of the way."

Woodberry again expressed disappointment that Murray admitted shooting at the officers: "I handled the situation so good to where [Murray was] all the way in the clear, then he goes right in there and admits that shit to them people."

Woodberry was indicted and charged with possessing a controlled substance with intent to deliver between four and two hundred grams of cocaine. Woodberry pleaded not guilty, was convicted by a jury, and was sentenced to 23 years' confinement.

## II. The trial court did not abuse its discretion by denying Woodberry's motion to suppress the evidence obtained during the raid.

In his first issue, Woodberry contends the trial court abused its discretion by not suppressing evidence obtained during the search. First, he suggests the trial court was required to suppress all evidence obtained during the raid because the affidavit supporting the search warrant contained false statements. Second, he contends the trial court was required to suppress any evidence not listed in the search warrant's return inventory. We address each argument in turn.

### A. Statements in the Affidavit

Woodberry first contends that the affidavit supporting the search warrant mischaracterized statements Sanders made during his interview with police. Woodberry argued to the trial court that the description of the duplex Sanders provided was not "in detail," as the affidavit suggested, and that Sanders did not immediately recognize the house on the Google Streets image provided by the officer. Thus, according to Woodberry, the affidavit's description of the information provided

by Sanders was made in violation of the principles set out in *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

To succeed in suppressing evidence based on a *Franks* challenge, Woodberry was required to prove by a preponderance of the evidence both that Bono intentionally or recklessly made false statements in the warrant affidavit and that the affidavit's remaining content (without the false statements) could not support a finding of probable cause. *See id.* When reviewing a trial court's ruling on a *Franks* motion, we give great deference to the trial court as the sole fact-finder and judge of the witnesses' credibility and weight of the evidence, and its ruling will be overruled only if outside the bounds of reasonable disagreement. *Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex. Crim. App. 1999); *see also Edwards v. State*, No. 05-98-00974-CR, 2000 WL 1048520, at *4 (Tex. App.—Dallas July 31, 2000, pet. ref'd) (not designated for publication).

Woodberry challenges the following statement in the warrant affidavit: "Sanders described the above listed duplex residence in detail (the street name, color of the structure, and style of residence), as well as confirmed the duplex residence and doorway in paragraph one (1) that he purchased the crack cocaine from on a printed google streets image." In his interview with police, Sanders did in fact provide the street on which the duplex was located, he described the house as "yellow" or "yellowish," and he told the officers he thought the house was a duplex. Further, although Sanders did not immediately recognize the printed image of the duplex taken from Google Streets, he confirmed (after taking a closer look at the image) that the image did appear to show the duplex and the doorway where he purchased the drugs.

The only part of the warrant affidavit that arguably is inconsistent with Sanders's videotaped interview is its statement that Sanders identified the structure's color. Sanders described the house as "yellow" or "yellowish" in his interview. The warrant affidavit lists the duplex as having a "tan colored stone face." Bono testified that when he initially visited the duplex,

he observed that it had a "yellow stonewash" color. And when Bono was questioned about Sanders's description of the house as "yellowish," despite the duplex actually being tan, Bono testified he believed the distinction was a matter of "semantics." We agree. The trial court could have concluded that Bono genuinely believed "yellowish" was an accurate description of the structure's color, and it would not have been "outside the bounds of reasonable disagreement" to conclude that Bono did not intentionally or recklessly make false statements about Sanders's identification of the structure. *See Hinojosa*, 4 S.W.3d at 247.

Moreover, even if we were to assume that Bono's statements about Sanders identifying the duplex were either intentionally false or were made with reckless disregard for the truth, Woodberry has not explained why the warrant affidavit's remaining content would be insufficient to support a finding of probable cause. Indeed, even if Sanders had never described the duplex, the affidavit explains that detectives witnessed Sanders purchasing crack cocaine there. Under the circumstances, we see no basis to overrule the trial court's decision not to suppress the evidence under *Franks*.

### *B. Return Inventory*

Woodberry next contends the trial court was required to suppress from evidence the Pyrex measuring cups and the firearms recovered during the raid, because they were not listed in the initial search warrant's return inventory in violation of article 18.10 of the Texas Code of Criminal Procedure. The State correctly points out, however, that the firearms were listed on the return inventory for a second search warrant executed in connection with the raid. Thus, Woodberry's challenge—to the extent it is based on the officers' failure to list the firearms in a return inventory—is facially baseless and we overrule it.

With respect to the Pyrex cups, the State correctly points out that the officers' failure to list the cups in a return inventory was, at most, a ministerial violation of article 18.10. Violations of

article 18.10 generally do not require suppression of the evidence obtained through a valid search because such violations necessarily occur only after the evidence has already been obtained legally. *See Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000).[4] Thus, unless Woodberry demonstrated prejudice due to unfair surprise, admitting the Pyrex cups into evidence could not have constituted reversible error. *See Phenix v. State*, 488 S.W.2d 759, 766 (Tex. App. 1972).

Woodberry did not argue before the trial court that he would be prejudiced by unfair surprise. Instead, he argued that admitting the cups would "constitute a violation of the spirit of Art. 18.10 of TCCP . . . ." Violating the spirit of article 18.10 would not require suppression if violating its letter would not. Regardless, Woodberry was not unfairly surprised by the State's introduction of the Pyrex cups. Evidence concerning the Pyrex cups was provided during discovery, and Woodberry demonstrated he was aware of both the Pyrex cups and the State's intention to admit them into evidence when he moved to suppress the cups before trial. The trial court did not abuse its discretion by denying Woodberry's motion to suppress evidence not listed in the return inventories. *See id.*; *see also Martinez*, 17 S.W.3d at 686.

### III. The evidence was sufficient to prove Woodberry possessed the drugs.

In his second issue, Woodberry contends the evidence was legally insufficient to prove that he had care, custody, or control of the cocaine seized during the raid. "When determining whether there is sufficient evidence to support a criminal conviction, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt." *Tate v. State*, 500 S.W.3d 410, 413 (Tex.

---

[4] In fact, after the search-warrant return was executed in this case, the legislature amended article 18.10 to make clear that, even if an officer were to fail to submit a return inventory altogether, it would not "bar the admission of evidence under Article 38.23." *See* Act of May 19, 2017, 85th Legislature, R.S., ch. 174, § 2, sec. 18.10, 2017 Tex. Sess. Law Serv. (West) (codified at TEX. CODE CRIM. PROC. ANN. § 18.10).

Crim. App. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). For purposes of this inquiry, direct and circumstantial evidence are equally probative. *Id.*

To convict Woodberry, the State was required to prove beyond a reasonable doubt, among other things, that Woodberry possessed the cocaine seized during the raid. By statute, "possession" refers to "actual care, custody, control, or management." TEX. HEALTH & SAFETY CODE ANN. § 481.002(38). Although police did not find the cocaine in Woodberry's exclusive possession, the jury could nevertheless convict Woodberry if sufficient independent facts and circumstances justified an inference that he possessed it. *Tate*, 500 S.W.3d at 413–14. The court of criminal appeals has provided a non-exclusive list of factors that may indicate the knowing possession of contraband and which may assist our analysis. Those factors include:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Id.* at 414.

Many of the factors support an inference that Woodberry possessed the cocaine. He was present during the search; the cocaine was in plain view in an enclosed space; he attempted to flee the duplex as police tried to enter[5]; and there were other drugs and paraphernalia present at the scene. In addition, Woodberry's text messages and jailhouse phone calls linked him to the drug

---

[5] Although the testimony of the police officer identifying Woodberry as the person attempting to exit from the rear of the duplex may conflict in some respects with his description of the suspect in his post-incident affidavit, we must presume the jury resolved any conflict in favor of the verdict. *Tate*, 500 S.W.3d at 413.

sales at the duplex. Woodberry texted Murray and appeared to ask what happened to money from a particular cocaine transaction. He also acknowledged in a text that he owed someone "for the biscuit," which appears to have been a reference to crack cocaine. Moreover, the same "cookie" or "biscuit" of crack cocaine seized during the raid appeared in a picture on Woodberry's phone. After his arrest, Woodberry acknowledged he "could've just grabbed up all the shit" while police officers fell back after being fired upon by Murray. The keys seized during the raid included keys to the duplex, the cage door, and Woodberry's truck—suggesting both that they were Woodberry's keys and that he had significant access to the duplex. Finally, and perhaps most importantly, one of the Pyrex cups seized during the raid, which tested positive for cocaine and appears to have been used manufacturing crack cocaine, had Woodberry's fingerprints on it. This evidence, viewed cumulatively and in the light most favorable to the verdict, was sufficient for the jury to conclude beyond a reasonable doubt that Woodberry possessed the cocaine seized during the raid.

### IV. The trial court did not err by overruling Woodberry's foundational objection to admission of the jailhouse calls.

In his third issue, Woodberry contends the trial court abused its discretion by admitting recordings of certain jailhouse phone calls over his objection that the State had failed to lay the proper predicate for their admission. Woodberry does not object (at least not on foundational grounds) to the recordings of phone calls made using the unique PIN number assigned to him at booking. But he argues the recordings of phone calls that were not made using his PIN number required additional voice identification before they could be admitted. The witness who identified Woodberry's voice at trial interacted with Woodberry in person only briefly and had received only a short verbal response to one of her questions. Thus, Woodberry argues, the State did not produce evidence sufficient to support a finding that the voice on the recordings was, in fact, Woodberry's. *See* TEX. R. EVID. 901(a).

The State could satisfy its authentication requirement by providing an opinion identifying Woodberry's voice which was "based on hearing the voice at any time under circumstances that connect it with the alleged speaker." Tex. R. Evid. 901(b)(5). Here, the identifying witness testified she had heard Woodberry's voice both in her brief personal interaction with him and in multiple calls recorded using Woodberry's unique PIN. Thus, contrary to Woodberry's argument, the voice identification was not based solely on the witness's brief personal interaction with Woodberry.[6]

Moreover, Woodberry appears to have identified himself in most of the phone calls introduced by the State,[7] as well as each of the calls transcribed and emphasized by the State. In State's Exhibit 258A, the caller identified himself as "Big Boi." And in Exhibits 258B, 259A, 259B, and 259C, the caller identified himself as "Dominique" for purposes of allowing the receiving party an opportunity to accept the call. Under the circumstances, the trial court did not abuse its discretion by determining the evidence was sufficient to support a finding that the phone calls were what they purported to be—phone calls made by Woodberry while he was in jail. *See* Tex. R. Evid. 901(a).

## V. The trial court did not abuse its discretion by overruling Woodberry's privacy objection.

In his final issue, Woodberry contends the trial court abused its discretion by denying his motion to suppress the jailhouse phone calls on grounds that the recordings violated his right to privacy under the Fourth Amendment as applicable to the State under the Fourteenth Amendment

---

[6] We express no opinion on whether a proper predicate would have been established if the voice identification was based solely on Woodberry's brief face-to-face interaction with the State's witness.

[7] The calls were made through a system that prompted the caller to identify himself so that the receiving party could decide whether to accept the call. The caller could be heard identifying himself as "Dominique" in the vast majority of the phone calls admitted into evidence. A small portion of the calls appeared to have no audible self-identification.

to the Constitution.[8] The Fourth Amendment prohibits unreasonable searches, which occurs when the government violates a subjective expectation of privacy that society recognizes as objectively reasonable. *See Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Whether a subjective expectation of privacy is one that society recognizes as being objectively reasonable is a question of law that we review de novo. *See Villarreal*, 935 S.W.2d at 138 n.5.

As a general matter, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates . . . required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984). Because "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security," it is accepted that a loss of privacy is an "inherent incident[] of confinement." *Id.*

As it relates more specifically to monitoring an inmate's phone calls, courts have uniformly rejected the contention that an inmate has a legitimate expectation of privacy in phone calls with non-lawyers, at least where, as here, there is notice that the calls are monitored. *See Hernandez v. State*, No. 03-03-00456-CR, 2005 WL 2043641, at *6 (Tex. App.—Austin Aug. 26, 2005, no pet.) (mem. op., not designated for publication) ("The evidence showed that the telephone system that inmates are allowed to use informs the callers that all calls are subject to being monitored. Not

---

[8] In his brief, Woodberry also argues that the recordings should have been suppressed because they were irrelevant, they were inadmissible evidence of extraneous bad acts, and because they violated his rights under the First, Fifth, Sixth, and Eighth Amendments. These arguments were not preserved for our review through a timely and specific objection in the trial court. *See* TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a). Outside the presence of the jury, Woodberry's counsel did state that portions of the phone calls were "not only private, but . . . are not relevant to . . . this case." The trial court then asked specifically, "What particular portion of the jail call are you arguing is not relevant?" Woodberry's counsel did not answer that question. Instead, counsel replied: "And not - - not only that, that could be extraneous." The trial court then instructed that "those objections need to be lodged at the time that [the State offers] the jail calls." But Woodberry did not reassert those objections when the calls were admitted into evidence. With respect to the *transcript* that was offered as Exhibit 259A, Woodberry's counsel argued that "some of the transcri[bed] conversations aren't relevant to this case," and "[s]o to the extent that they [aren't] relevant, that will be part of the objection we make today." But he again failed to identify which portions of the calls or transcripts were not relevant. And he neither renewed nor explained his extraneous-acts objection. Regardless, even if he had preserved an objection on either basis, he has not developed any arguments on appeal concerning relevance or extraneous bad acts. Indeed, apart from conclusory assertions in his statements and restatements of the issues, his brief fails to even mention relevance or extraneous bad acts. We therefore overrule Woodberry's fourth issue to the extent it is based on relevance, extraneous bad acts, or constitutional objections beyond his assertion that the calls violated his right to privacy under the Fourth and Fourteenth Amendments.

only did appellant have a diminished expectation of privacy because of his confinement, he was specifically warned that use of that particular telephone system was monitored. . . . Accordingly, we hold that appellant's Fourth Amendment rights were not violated as he did not have a reasonable expectation of privacy regardless of his subjective expectation."); *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) ("[N]o prisoner should reasonably expect privacy in his outbound telephone calls. . . . We hold that any expectation of privacy in outbound calls from prison is not objectively reasonable . . . ."); *United States v. Sababu*, 891 F.2d 1308, 1330 (7th Cir. 1989) (holding there is no reasonable expectation of privacy in a telephone conversation between a non-lawyer and a federal inmate); *United States v. Willoughby*, 860 F.2d 15, 20 (2d Cir. 1988) (rejecting contention that pretrial detainees have reasonable expectation of privacy in calls to non-attorneys from institutional telephones); *see also Escalona v. State*, No. 05-12-01418-CR, 2014 WL 1022330, at *10 (Tex. App.—Dallas Feb. 20, 2014, pet. ref'd) (mem. op., not designated for publication) (noting that there is no legitimate expectation of privacy in phone calls placed from jail for purposes of determining whether the calls were illegally intercepted under section 16.02 of the Texas Penal Code).

Woodberry had no objectively reasonable expectation of privacy in his outgoing phone calls from the jail. The trial court thus did not abuse its discretion by overruling his privacy objection under the Fourth Amendment.

We affirm.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180728F.U05

–15–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

DOMINIQUE WOODBERRY, Appellant

No. 05-18-00728-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas
Trial Court Cause No. F17-52253-U.
Opinion delivered by Justice Carlyle. Chief Justice Burns and Justice Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 2nd day of July, 2019.